Opinion of March 3, 2011, Withdrawn, Affirmed and Substitute Opinion
filed May 26, 2011.

 

In The

 

Fourteenth Court of
Appeals

___________________

 

NO. 14-08-00963-CR

___________________

 

Christine Marie Paolilla,
Appellant

 

V.

 

The State of Texas, Appellee



 



 

On
Appeal from the 351st District Court

Harris County,
Texas



Trial Court Cause No. 1169491

 



 

 

SUBSTITUTE OPINION

Appellant
Christine Marie Paolilla filed a petition for discretionary review. Pursuant to
Texas Rule of Appellate Procedure 50, we withdraw our opinion of March 3, 2011,
and issue this substitute opinion in its place.

Appellant was convicted
of capital murder. She was seventeen years old at the time of the offense, and therefore ineligible to receive the death
penalty. See Tex. Penal Code § 8.07(c) (West 2010). Because the
State could not seek capital punishment, she was sentenced to a mandatory term
of life imprisonment instead. On appeal, she challenges the constitutionality
of her sentence, the denial of her motion to suppress, and the denial of her
motion for mistrial. We affirm.

FACTS

Four people were
murdered in a Clear Lake home during the afternoon of July 18, 2003. The home
belonged to Tiffany Rowell, who was counted among the four complainants. The
other three were her friends Rachel Koloroutis, Marcus Precella, and Adelbert
Sanchez.

Nearly three years after
the offense, police received a tip through Crime Stoppers linking the homicides
to appellant and her then-boyfriend, Christopher Lee Snider. A warrant was
secured for appellant’s arrest in San Antonio, where she had been staying in a
hotel with her husband, Stanley Justin Rott.

The Arrest and Appellant’s Recorded Statements

            The
warrant was executed at 11:55 a.m. on July 19, 2006. When police entered the
hotel room, they were met with evidence that the occupants had been using substantial
amounts of heroin. Hundreds of used syringes littered the room. Appellant was
wearing a t-shirt stained with blood, and several needle marks could be found
over her body.

            Appellant
was escorted to the San Antonio Police Department, where she agreed to a video-taped
interview at 2:45 p.m. During the interrogation, appellant admitted to driving Snider
to Rowell’s house on the day of the offense. She said they originally went
there to purchase drugs, but they made a return trip when Snider complained of
forgetting something. Appellant insisted that Snider went into the house by
himself on both occasions while she remained in the car. When Snider returned
the second time, she saw him running with a gun in his hands. She denied ever
hearing any gunshots. 

The interrogation ended
at approximately 3:50 p.m. Appellant, however, remained alone in the interview
room as the recorder continued to tape. In the ensuing minutes, her condition
clearly began to deteriorate. She grew visibly tired, appearing weak and sick.
The recording ended just after 3:58 p.m., when appellant requested to see a
nurse, claiming she was bleeding.

Appellant was
transported to Santa Rosa Hospital in San Antonio at approximately 4:12 p.m.
Medical records indicate she was currently menstruating, but no other signs of
bleeding were reported. Appellant did present, though, with a chief complaint
of heroin withdrawal. She informed doctors that she was accustomed to taking
heroin every ten to fifteen minutes, and that her last injection was roughly
10:00 a.m. that morning. At 5:30 p.m., appellant was administered six
milligrams of morphine and twenty milligrams of Methadone.

Using only an audio
recorder, interrogators continued their interview inside the hospital at 6:15
p.m. During this session, appellant again denied ever entering the home. She
stated, however, that a fight erupted inside, with Snider admitting to shooting
all four complainants. The interview concluded at 7:15 p.m. At approximately
9:00 p.m., just before her discharge, appellant received additional dosages of
morphine and Methadone.

Appellant was flown to
Houston later that evening. She slept on the flight and through part of the
next day after being placed in a jail cell. Following an unrecorded interview
during the afternoon of July 20, appellant complained of illness and requested
to see a doctor. She was taken to Ben Taub Hospital at 6:50 p.m. and again
treated for heroin withdrawal, this time receiving twenty-five milligrams of
Librium at 10:07 p.m. Appellant was discharged at 11:00 p.m. and escorted back
to police headquarters in downtown Houston.

A final video-taped
interrogation commenced at 11:38 p.m. During this interview, appellant stated
that Snider forced her into the house on the return trip, making her hold one
of his two guns. Although she denied aiming at any of the complainants, she
stated that Snider pulled the trigger a number of times while she held the gun
in her hand. The interrogation ended at 1:39 a.m. on July 21. Appellant was
then returned to her jail cell. The record does not show that she complained of
illness following the interview.

The Suppression Hearing

            In
a pretrial hearing, appellant moved to suppress all three recorded statements. Although
advised of her Fifth Amendment rights before each interview, appellant
complained that her statements were rendered involuntary because of medications
she ingested and because she was suffering from acute opioid withdrawal.

            Appellant
called a single expert witness, Dr. George S. Glass, a physician board
certified in psychiatry and addiction medicine. Dr. Glass testified that
appellant was a heroin addict with a very high tolerance for narcotics. He
stated that heroin has a short half-life, meaning that it breaks down in the
body relatively quickly. If the addiction is not sustained, an abuser can
suffer from withdrawal between four and eight hours after her last injection. The
physical symptoms of withdrawal, he said, include chills, fever, shaking,
nausea, vomiting, and seizing.

            Dr.
Glass assumed that appellant’s last use of the drug prior to her arrest
occurred between 10:00 a.m. and 12:00 p.m. on July 19. Based on that time
frame, he supposed that appellant would have entered serious opioid withdrawal
between 4:00 p.m. and 8:00 p.m. that evening. Dr. Glass observed the first
video-taped interrogation, which ended just before 4:00 p.m., and opined that
appellant was in acute withdrawal because she was wrapped in a thin blanket and
shaking.

            Dr.
Glass also described the drug treatment appellant received following her
arrest. He said that six milligrams of morphine was a significant dosage
normally reserved for intense pain, similar to the type of pain experienced by
an adult male during a heart attack. Methadone, however, is commonly used when
treating opioid dependence. The drug has a much longer half-life than heroin,
and patients who take Methadone will not usually enter maximum withdrawal until
twenty-four hours after it was last ingested. Dr. Glass also stated that the
high dosage of Methadone demonstrated the extent of appellant’s heroin
addiction—the average person would have been comatose on that dosage if not
similarly tolerant to the drug.

Dr. Glass explained that
Librium is a minor tranquilizer also used in treating addictions. The drug
removes the anxiety of withdrawal, but it does nothing for the cravings or for
certain physiological symptoms, such as vomiting, nausea, diarrhea, and bone
aches. According to Dr. Glass, appellant’s dosage of Librium was the equivalent
of consuming three to five shots of alcohol.

            Dr.
Glass testified that appellant was not intoxicated during her third interview
in Houston. However, he opined that she did exhibit certain withdrawal
symptoms, referencing a moment where she mentioned a desire to throw up. Dr.
Glass observed shaking and anxiety, testifying that appellant’s posture was “a
little bizarre,” as though her muscles were in spasm. Because appellant
received her last dosage of Methadone more than twenty-six hours before this
interview, Dr. Glass found her symptoms consistent with a person entering the
peak of withdrawal.

            The
State produced testimony from three police officers. Sergeant Brian Harris
executed the arrest warrant and conducted the two recorded interviews in San
Antonio. He testified that he has been a certified peace officer for twenty-one
years. During his tenure on the police force, he personally observed the effects
of heroin on users, which he claimed are typically marked by irrational
behavior and slurred and incoherent speech. He has also observed the physical
breakdown of a person entering withdrawal.

            According
to Sergeant Harris, appellant did not appear to be under the influence of
narcotics at the time of her arrest. During the first recorded interview, he
stated that appellant was clear and calm, and her tone suggested an inquisitive
demeanor. He testified that appellant did shake occasionally, but only when she
was crying, which occurred during the interview’s more sensitive discussion of
the complainants, who appellant revealed were her friends and classmates.
Sergeant Harris denied seeing any signs of intoxication. When questioned
whether appellant deliberated before giving her answers, he described her
responses as “calculated.”

            Sergeant
Harris accompanied appellant on her transfer to Santa Rosa Hospital. He
testified that appellant was relaxed and conversational during the hospital
interview. He described her answers as clear and concise. Despite her
treatments of morphine and Methadone, Sergeant Harris testified that appellant
did not appear to be under the influence of any sort of intoxicant. Rather, he
stated she was conscious and alert, and she made appropriate hand gestures when
communicating her story.

            Officer
Connie Park managed the intake desk at the Houston Police Department on the
night of July 20, 2006. Officer Park testified to having twelve years of
experience with the police department, four of which were spent on the Gang
Task Force. During those four years, she encountered a number of people who
were impaired by the influence of drugs.

Sometime between 5:30
p.m. and 6:30 p.m. on July 20, Officer Park was asked to escort appellant to
the bathroom, where they had a casual conversation. Officer Park testified that
during their brief discussion, she observed none of the signs of impairment
that typically accompany drug abuse. Officer Park described appellant’s speech
as “clearly coherent” and “matter of fact.” In her view, appellant appeared to
be oriented to time and place, and neither upset nor distraught. She also
testified that appellant made no complaints about withdrawing from heroin.

            Sergeant
Breck C. McDaniel conducted the video-taped interview in Houston. He testified
to having thirteen years of experience with the Houston Police Department. In
that time, his work has involved some exposure with heroin addicts. He stated
that heroin is a depressant, and addicts tend to appear tired or lethargic. He
also testified that he has witnessed the symptoms of withdrawal, which
primarily include vomiting, seizing, sweating, and visible illness.

Sergeant McDaniel
testified that appellant displayed none of these symptoms during her interview.
Occasionally, appellant did seem upset. When she recounted the shootings, for
instance, her hands shook and she began to cry. Sergeant McDaniel allowed her
frequent breaks to compose herself, even permitting her to smoke and drink a
soda. According to him, she appeared physically fine and lucid throughout the
interview.

            The
trial court denied appellant’s motion to suppress. The court later issued
findings of facts, which stated that the testimony from Sergeant Harris,
Officer Park, and Sergeant McDaniel was credible and reliable. In the findings,
the court also concluded that appellant was not intoxicated or suffering from
withdrawal symptoms, and that during all three interviews, she was “lucid and
capable of understanding the warnings given to her and the nature of her
statements.” Furthermore, the court specifically found that Dr. Glass’s
opinions were “not supported by the evidence and therefore not reliable.”
Because the court determined that appellant voluntarily waived her rights in
supplying her statements, all three recordings were later published for the
jury’s consideration.

The Trial

            Two
eyewitnesses placed appellant at the scene of the crime. Michelle and Craig
Lackner lived next door to Tiffany Rowell. The Lackners testified that on the
day of the offense, they both observed a young man and woman casually walk down
the street and approach Rowell’s house. In court, the Lackners identified
appellant as the girl they had witnessed. They denied seeing her with a gun, but
they each said that she was carrying a purse. Using a six-person photo spread,
the Lackners also identified Snider as the accompanying male. 

Rott was called as a
witness for the prosecution as well. He testified to calling in the tip to
Crime Stoppers after learning of the offense from his wife. Rott said that he
met appellant at a drug treatment center in Kerrville around November 2004,
more than a year after the murders. The two were married about four months
later. During their courtship, appellant vaguely told him of an incident with
her former boyfriend that resulted in the deaths of four people. On a later
occasion, she elaborated that she and Snider went to Rowell’s house in Clear
Lake. Just before entering the house, Snider handed her a gun, which she
carried in her purse. The intention was to take some drugs and money, but not
hurt anyone, she stressed. 

According to Rott,
appellant mentioned that she and Snider were invited into Rowell’s house, where
they eventually started shooting at the four people inside. After leaving,
appellant told Snider that she needed to make sure they were really dead.
Appellant then returned to find Koloroutis choking on her own blood. Rott
testified that appellant admitted to beating Koloroutis with her gun until she was
dead.

Bullets from two
separate weapons were recovered at the scene. Kim Downs, the State’s firearms
examiner, testified that bullets from both sets of guns were found in the
bodies of Rowell and Precella. The bullets were later traced to two handguns found
in Louisville, Kentucky, in a safe stored at the home of Snider’s stepfather.
Dr. Morna Gonsoulin, the State’s medical examiner, testified that in addition
to several gunshot wounds, Koloroutis suffered skull fractures consistent with
blunt force trauma to the head.

            Part
of appellant’s defensive strategy was to attack Rott’s credibility. In his
opening statement, defense counsel suggested that Rott reported his wife to
Crime Stoppers in order to claim a substantial reward. Defense counsel further
argued that Rott made a deal with the State to testify falsely against
appellant so that he might avoid prosecution for the heroin recovered in the
San Antonio hotel. Defense counsel attempted to elicit testimony regarding this
deal from Thomas Pardue and his daughter, Lane, a woman whom Rott began to date
following appellant’s arrest. Much of the Pardues’ testimony was interrupted by
various objections from the State.

            During
closing argument, defense counsel again referred to Rott’s alleged deal with
the prosecution and his relationship with the Pardues. The trial court
sustained the prosecutor’s objection to these arguments as being outside the
record. The prosecutor then responded to these exact arguments in his own
closing statement. The prosecutor told the jury:

Mr. Pardue. I feel sorry for that man, I truly do. I mean,
he has gone through hell for his daughter, but you don’t get to know
everything. You probably figured out by now you cannot know all the facts and
circumstances of a case. You hear us making objections, you’ve got to go
outside the room, come back inside the room. You don’t know the whole truth
about everything that happened in this case. When it’s all over, we will tell
you the whole truth.

            Appellant
objected that this argument improperly encouraged the jury to convict her on
facts not admitted in evidence. The objection was sustained, and the trial
court instructed the jury to disregard the statement. The trial court further
admonished that “the only thing you can base your verdict on is the evidence
that you have in front of you.” Appellant also moved for a mistrial, but that
was denied.

            The
jury returned a verdict of guilty after receiving the trial court’s instruction
on the law of parties. Appellant was then sentenced to a mandatory term of life
imprisonment.

ISSUES PRESENTED

            In
her first issue, appellant contends a mandatory life sentence violates the
Eighth Amendment’s proscription against cruel and unusual punishment when
imposed on a juvenile offender. In her second issue, she contends the trial
court abused its discretion by denying her motion for mistrial. In issues three
through six, she contends the trial court erred in dismissing the opinions of
Dr. Glass and in denying her motion to suppress. We examine these issues
slightly out of order, considering her second issue last.

CRUEL AND UNUSUAL PUNISHMENT

            At
the time of the offense, section 12.31 of the Texas Penal Code stated that “[a]n
individual adjudged guilty of a capital felony in a case in which the state
does not seek the death penalty shall be punished by imprisonment in the
institutional division for life.” Act approved June 19, 1993, 73d Leg., R.S.,
ch. 900, § 1.01, 1993 Tex. Gen. Laws 3586, 3602 (amended 2009). Appellant
contends this automatic sentence is grossly disproportionate as applied to
juveniles because it forecloses the opportunity of producing evidence of
mitigating circumstances. 

            We
have previously held that a mandatory life sentence does not amount to cruel
and unusual punishment, even when applied to juvenile offenders. See Laird
v. State, 933 S.W.2d 707, 714 (Tex. App.—Houston [14th Dist.] 1996, pet.
ref’d) (“Presumably, the law statutorily considers youth in mitigation of the
death penalty and thereby mandates the lesser of the two possible punishments
for capital murder.”). Appellant now urges us to reach the opposite conclusion
in light of recent Supreme Court decisions. In particular, appellant relies on Graham
v. Florida, 130 S. Ct. 2011 (2010), and Roper v. Simmons, 543 U.S.
551 (2005), two cases which recognized that juvenile offenders should not be
punished as harshly as their adult counterparts.

            In
Graham, the Supreme Court determined that the Eighth Amendment
proscribes a sentence of life without parole for a juvenile offender convicted
of a non-homicide crime. Graham, 130 S. Ct. at 2034. In Roper,
the Court ruled that the Eighth Amendment similarly prohibits the imposition of
capital punishment on juveniles. Roper, 543 U.S. at 578. Both
cases observe that juveniles are inherently different from adults, and because
of their innate differences, the Court reasoned that a punishment that is
permissible for adults may occasionally be disproportionate when applied to
younger offenders. See Graham, 130 S. Ct. at 2026 (noting that juveniles
have an objective lack of maturity, underdeveloped sense of responsibility,
vulnerability to negative influences, and unformed characters); Roper,
543 U.S. at 569–70 (same). Because the Texas capital murder statute did not
distinguish between adults and juvenile offenders at the time of her offense,
appellant contends her mandatory sentence is likewise disproportionate.

            Appellant
raises an issue not directly addressed by either Graham or Roper:
whether a mandatory sentence of life with the possibility of parole may be
imposed on a juvenile convicted of a capital offense. When faced with a
categorical challenge to a term-of-years sentence, the reviewing court must
first consider the “objective indicia of society’s standards, as expressed in legislative
enactments and state practice.” Roper, 543 U.S. at 563; see also
Graham, 130 S. Ct. at 2022–23 (applying Roper’s categorical
rules where  “a threshold comparison between the severity of the penalty and
the gravity of the crime does not advance the analysis”). The court examines
this objective evidence to determine whether a national consensus exists
against the sentencing practice at issue. See Roper, 543 U.S. at 563.
Although “entitled to great weight,” evidence of national consensus is not
itself determinative of whether a punishment is cruel and unusual. Kennedy
v. Louisiana, 554 U.S. 407, 434 (2008). Because the task of interpreting
the Eighth Amendment remains a judicial responsibility, the court must still
exercise its independent judgment to determine whether the punishment violates
the Constitution. Roper, 543 U.S. at 575. This judgment is guided by
consideration of the moral culpability of the offenders at issue in light of
their crimes and characteristics, the severity of the punishment, and whether
the punishment serves legitimate penological goals. Graham, 130 S. Ct.
at 2026; cf. Meadoux v. State, 325 S.W.3d 189, 194 (Tex. Crim. App.
2010) (applying the same factors to a challenge involving a juvenile capital
offender who was sentenced to life without the possibility of parole).

            Balancing
all of these factors, we cannot conclude that appellant’s mandatory sentence
amounts to cruel and unusual punishment. Appellant has not produced any
evidence of a national consensus against the sentence imposed. Even though a
juvenile’s culpability may be diminished when compared to an adult, the Texas
Court of Criminal Appeals has recently recognized that the moral culpability of
a juvenile capital offender is still substantial. See Meadoux, 325
S.W.3d at 195.

In Meadoux, the
Court of Criminal Appeals affirmed a juvenile capital offender’s mandatory
sentence of life without parole. See id. at 195–96 (finding that the
punishment served legitimate penological goals). Following Meadoux, we
cannot conclude that appellant’s lesser sentence is grossly disproportionate
simply because the capital murder statute did not distinguish between juveniles
and adults at the time of the offense. Appellant’s first issue is overruled.            

MOTION TO SUPPRESS

            In
issues three through six, appellant contends the trial court should have
suppressed her three recorded statements.

The recording of an
interrogation may not be introduced into evidence unless the defendant
knowingly, intelligently, and voluntarily waives her Fifth Amendment rights.
Tex. Code Crim. Proc. Ann. art. 38.22, § 3(a) (West 2005); Miranda v.
Arizona, 384 U.S. 436, 444, 474–75 (1966). Appellant argues that waiver was
involuntary in this case because her recorded statements were procured as she
was either withdrawing from heroin or under the influence of morphine,
Methadone, and Librium.

We examine a trial
court’s ruling on a motion to suppress using a bifurcated standard of review. Wilson
v. State, 311 S.W.3d 452, 457–58 (Tex. Crim. App. 2010). We afford “almost
total deference to a trial court’s determination of historical facts,”
especially when the trial court’s findings are based on an evaluation of the
credibility and demeanor of the witnesses. Guzman v. State, 955 S.W.2d
85, 89 (Tex. Crim. App. 1997). If supported by the record, the trial court’s
ruling will not be disturbed. Romero v. State, 800 S.W.2d 539 (Tex.
Crim. App. 1990). The only question we review de novo is whether the trial
court properly applied the law to the facts presented. Carmouche v. State,
10 S.W.3d 323, 327 (Tex. Crim. App. 2000).

The voluntariness of a
statement is assessed by considering the totality of the circumstances under
which the statement was obtained. Creager v. State, 952 S.W.2d 852, 855
(Tex. Crim. App. 1997). Of principal concern are the characteristics of the
accused and the details of the interrogation. Davis v. State, 313 S.W.3d
317, 337 (Tex. Crim. App. 2010). Although relevant, evidence of intoxication
does not necessarily render a statement involuntary. Jones v. State, 944
S.W.2d 642, 651 (Tex. Crim. App. 1996); King v. State, 585 S.W.2d 720,
722 (Tex. Crim. App. [Panel Op.] 1979). When the record reflects evidence of
narcotics, medications, or other mind-altering agents, the question becomes
whether those intoxicants prevented the defendant from making an informed and
independent decision to waive her rights. See Jones, 944 S.W.2d at 651; see
also Nichols v. State, 754 S.W.2d 185, 190 (Tex. Crim. App. 1988) (“The
central question is the extent to which appellant was deprived of his faculties
due to the intoxication.”), overruled on other grounds by Green v. State,
764 S.W.2d 242 (Tex. Crim. App. 1989).

We recognize that
appellant’s drug abuse was significant, and her medical treatment considerable.
Nevertheless, the record supports the trial court’s ruling that appellant was
capable of making an informed decision to waive her rights. Appellant did not
appear intoxicated at any stage of her three recorded interrogations. Sergeant
Harris testified that appellant spoke clearly and concisely during both
interviews in San Antonio. During her first interview, appellant’s responses
were described as “calculated.” At the hospital, Sergeant Harris said she was
conscious and alert. Officer Park testified that appellant was oriented to her
surroundings, and Sergeant McDaniel testified that she was physically fine and
lucid during her Houston interview. All three officers testified to having experience
dealing with heroin addicts, and each denied witnessing any signs that
appellant was withdrawing from heroin or under the influence of any sort of
intoxicant. The court, as trier of fact during the suppression hearing, was
free to believe the officers over the testimony of the expert. See
McGalliard v. Kuhlmann, 722 S.W.2d 694, 697 (Tex. 1986).

Although we defer to the
trial court’s finding that Dr. Glass’s opinions were not credible, Guzman,
955 S.W.2d at 89, we do observe that Dr. Glass similarly testified that
appellant was not intoxicated from any of the drugs she received. Even if
appellant was further suffering from the effects of withdrawal, as Dr. Glass
claimed, the evidence does not support appellant’s argument that she was unable
to make an informed decision to waive her rights. Cf. Davis, 313 S.W.3d
at 337–38 (finding waiver voluntary despite confessor’s testimony that he was
“coming off” drugs where confessor was calm and exhibiting a rational
understanding of the questioning); United States v. Kelley, 953 F.2d
562, 565 (9th Cir. 1992) (finding waiver voluntary despite symptoms of
withdrawal where confessor was coherent, responsive, and displaying an ability
to think rationally), disapproved on other grounds by United States v.
Kim, 105 F.3d 1579 (9th Cir. 1997). We find support for the testimony of the
officers in our own review of the recordings. We therefore conclude that the
record supports the trial court’s conclusion that appellant voluntarily waived
her rights.

Appellant still argues
that her statements should have been suppressed under the authority of Townsend
v. Sain, 372 U.S. 293 (1963), overruled on other grounds by Keeney
v. Tamayo-Reyes, 504 U.S. 1 (1992). In Townsend, a heroin addict
confessed to murder after receiving treatment with a drug having the properties
of a “truth serum.” Id. at 297–98. The drug was administered because the
addict was entering opioid withdrawal. Id. The Supreme Court held that a
“coherency” standard was not the appropriate test for determining whether a
drug-induced statement was voluntarily made. Id. at 320. Rather, the
appropriate inquiry is whether the individual’s will was overborne, or whether
his statement was the product of a rational intellect and a free will. Id.
at 307. Appellant argues that the trial judge’s findings should be disregarded
because he used the wrong standard.

We do not find that
appellant’s recorded statements were admitted in violation of Townsend.
Appellant may have very likely been under the influence of heroin during
her first interrogation, yet no one, including Dr. Glass, actually testified
that she appeared intoxicated. Moreover, Dr. Glass never testified that heroin
by itself was sufficient to abrogate appellant’s free will. See King,
585 S.W.2d at 722 (holding that heroin taken on day of confessing did not
render confession involuntary).

Dr. Glass also failed to
explain how any of the medications appellant received acted in the nature of a
“truth serum.” He merely testified that appellant was treated with morphine and
Methadone to begin her detox and to stabilize her condition before her transfer
to Houston. Although appellant received potent dosages of each drug, no one
testified that either morphine or Methadone would render appellant incapable of
understanding her rights. After receiving this treatment, appellant did not
slur her words during the second interview. She did not pause inappropriately
before answering a question, nor did she seem confused. Nothing on the audio
recording indicated that appellant was incompetent to testify. Likewise, there
was no testimony that the combined effect of morphine and Methadone had
overcome appellant’s free will, making her appear competent when, in fact, she
was not.

Before her third
recorded interview in Houston, appellant received Librium to treat the anxiety
associated with her heroin withdrawal. Dr. Glass testified that the amount of
Librium administered was the equivalent of several shots of alcohol, and that
it did nothing for the physical symptoms of withdrawal. Dr. Glass agreed with
the officers, however, that appellant was not intoxicated when she offered her
statements. Moreover, Dr. Glass never testified that Librium would prevent
appellant from waiving her rights freely and knowingly.

The record supports the
trial court’s finding that appellant’s statements were not induced from either the
medications she received or the effects of withdrawal. Because her recorded
statements were not admitted in violation of Townsend, we overrule
issues three through six.

MOTION FOR MISTRIAL

            In
her last remaining issue, appellant challenges the trial court’s refusal to
grant a mistrial after the prosecutor’s improper closing argument.

We review a trial
court’s ruling on a motion for mistrial for an abuse of discretion. Hawkins
v. State, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004). When the refusal to
grant a mistrial follows an objection for improper jury argument, we evaluate
the trial court’s decision using the following factors: (1) the severity
of the misconduct; (2) the measures adopted to cure the misconduct; and
(3) the certainty of conviction absent the misconduct. Id. (citing Mosley
v. State, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998)). Balancing these
factors in the light most favorable to the trial court’s ruling, we conclude
that the trial court did not abuse its discretion in denying appellant’s motion
for mistrial.

When assessing the
severity of an improper jury argument, our primary focus is the prejudicial
effect of the misconduct. Id. In deciding whether prejudice was incited,
we examine the statement “in light of the facts adduced at trial and in the
context of the entire argument.” See McGee v. State, 774 S.W.2d 229, 239
(Tex. Crim. App. 1989); Gaddis v. State, 753 S.W.2d 396, 398 (Tex. Crim.
App. 1988); see also Wood v. State, 18 S.W.3d 642, 648 (Tex. Crim. App.
2000) (“The determination of whether a given error necessitates a mistrial must
be made by examining the particular facts of the case.”).

Argument that places the
jury outside the record has always been held to be improper. See Everett v.
State, 707 S.W.2d 638, 641 (Tex. Crim. App. 1986). The prosecutor’s remarks
in this case are no exception. But despite being highly inappropriate, we
cannot conclude that the argument was clearly prejudicial when taken in
context. The argument followed defense counsel’s own closing statement where he
claimed that Rott made a deal with the State to testify falsely against
appellant. Testimony of this side deal was limited during trial because of
various objections from the State. The prosecutor referenced these very
objections just before his remark that the jury cannot know “the whole truth
about everything that happened in this case.” The immediate discussion was focused
entirely on the questions surrounding Rott’s alleged deal, not appellant’s
involvement in the murders. Viewed in this context, even though the prosecutor
did venture outside the record, his argument did not introduce a risk that the
jury would convict appellant on facts not in evidence. At most, the argument
suggested that an agreement did exist between Rott and the State. As this could
only damage Rott’s credibility, we do not believe that the prosecutor’s
argument was so prejudicial as to warrant a mistrial.

In considering the
second factor, we generally presume that a prompt instruction to disregard will
cure any error associated with improper jury argument. Phillips v. State,
130 S.W.3d 343, 356 (Tex. App.—Houston [14th Dist.] 2004, pet. ref’d). “Only
offensive or flagrant error warrants reversal when there has been an
instruction to disregard . . . .” Wesbrook v. State,
29 S.W.3d 103, 116 (Tex. Crim. App. 2000). In this case, the trial court
promptly instructed the jury to disregard the prosecutor’s statement, adding
further that the jury should only consider evidence that has actually been
admitted. The prosecutor’s argument was not extreme or in violation of a
mandatory statute, and it did not inject any new facts into the case that were
harmful to appellant. Cf. Thompson v. State, 89 S.W.3d 843, 850–51 (Tex.
App.—Houston [1st Dist.] 2002, pet. ref’d) (holding prosecutor’s argument was
improper where it encouraged the jury to speculate on “a very important reason”
he could not legally disclose). Accordingly, we do not believe that the
argument was so blatant as to render the curative instruction ineffective. See
Wesbrook, 29 S.W.3d at 115.

Finally, even if the
prosecutor’s argument did encourage the jury to speculate on facts not in the
record, evidence of appellant’s participation in the murders was already
well-substantiated. For instance, the Lackners witnessed appellant casually
approaching Rowell’s house on the day of the murders. In her third recorded
statement, appellant herself admitted to being inside the home and holding a
gun as her boyfriend pulled the trigger. Bullets from both guns used in the
murders ultimately struck two of the complainants. Although this evidence may
not be suggestive of direct guilt, we cannot say that the prosecutor’s argument
affected the likelihood of appellant’s conviction as a party to the murders.

Having considered each
of the factors adopted in Hawkins, we conclude the trial court did not
abuse its discretion by denying appellant’s motion for mistrial. Appellant’s
second issue is overruled.

CONCLUSION

The judgment of the
trial court is affirmed.

 

                                                                                    

                                                                        /s/        Tracy
Christopher

                                                                                    Justice

 

 

 

Panel consists of Justices Seymore, Boyce, and
Christopher.

Publish — Tex. R. App. P. 47.2(b).