STATE of Wisconsin, Plaintiff-Respondent,

v.

Brian T. ST. MARTIN, Defendant-Appellant.

Supreme Court

*No. 2009AP1209–CR. Oral argument March 9, 2011.*
*—Decided June 22, 2011.*

2011 WI 44

(Also reported in 800 N.W.2d 858.)

For the defendant-appellant, there were briefs and oral argument by *Michael K. Gould,* assistant state public defender.

For the plaintiff-respondent the cause was argued by *Sarah K. Larson,* assistant attorney general, with whom on the brief was *J.B. Van Hollen,* attorney general.

¶ 1. N. PATRICK CROOKS, J. This case comes before us by certification from the court of appeals and concerns the constitutionality of a warrantless search of an apartment attic. Police obtained consent from Brian St. Martin's girlfriend, who was present in the apartment, to search the attic. They then asked the same question of St. Martin, who was by that point in police custody in a police van parked nearby. He refused. The police proceeded to search the attic and found cocaine and currency. A warrant was subsequently obtained, and a second search was then conducted, and police seized cell phones, currency, a scale, and documents. St. Martin was later charged based on the evidence seized in the searches. He pleaded guilty and was convicted after the circuit court denied his suppression motion, which argued that the warrantless search violated state and federal constitutional protections against unreasonable search and seizure because under the rule set forth in *Georgia v. Randolph,* his co-tenant's consent could not trump his express refusal.[1]

---

[1] St. Martin also argued that the search warrant was invalid because it was issued based in part on two kinds of tainted evidence—the evidence seized from the warrantless search and statements police inaccurately attributed to St. Martin's girl-

¶ 2. This appeal and the certification followed. The certified question is stated as follows: "Whether the rule regarding consent to search a shared dwelling in *Georgia v. Randolph,* 547 U.S. 103 (2006), which states that a warrantless search cannot be justified when a physically present resident expressly refuses consent, applies where the physically present resident is taken forcibly from his residence by law enforcement officers but remains in close physical proximity to the residence such that the refusal is made directly to law enforcement on the scene?" The answer to the question is that the rule in *Randolph* does not apply in such a case although the language therein explaining the holding is very helpful and supports our analysis. Unlike the *Randolph* defendant's objection, St. Martin's objection to the search was not made when he was physically present at the residence. Instead, the applicable rule is the one stated in another shared-dwelling consent search case, *United States v. Matlock,* which holds that a co-tenant's consent to search is valid "as against the absent, nonconsenting [co-tenant]." *United States v. Matlock,* 415 U.S. 164, 170 (1974).

¶ 3. We consider this case in light of *Matlock* and *Randolph,* two United States Supreme Court cases examining the legality of warrantless searches based on consent in two slightly different shared-dwelling cases. In the first case, *Matlock,* the Supreme Court upheld a warrantless search where only one resident had given consent. It held that "the consent of one who possesses common authority over premises or effects is valid as

friend that overstated her knowledge of St. Martin's drug involvement—and that because the warrant was defective the second search was illegal as well. He therefore argued that the evidence seized in both searches must be suppressed under the exclusionary rule.

against the absent, nonconsenting person with whom that authority is shared." *Matlock,* 415 U.S. at 170. William Earl Matlock had been "arrested in the yard in front of the . . . home" where he lived, and a woman who also lived there gave consent to police to search the house while the defendant was detained "in a squad car a distance from the home." *Id.* at 166, 179. Police never asked Matlock for his consent for the search. *Id.*

¶ 4.  The second case, *Randolph,* established the rule that is the focus of the certified question. In *Randolph,* a warrantless search was conducted pursuant to the consent of one resident even though the second resident was present on the threshold and objected. There the United States Supreme Court held that the warrantless search violated constitutional protections, on the grounds that "the cooperative occupant's invitation adds nothing to the government's side to counter the force of an objecting individual's claim to security against the government's intrusion into his dwelling place." *Randolph,* 547 U.S. at 115. The *Randolph* Court noted it was drawing a fine line between the *Matlock* and *Randolph* fact patterns such that "if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, *nearby but not invited to take part in the threshold colloquy,* loses out." *Id.* at 121 (emphasis added). The Court thus struck a pragmatic balance that gives a non-consenting tenant, but only one who is present for the "threshold colloquy," the power to negate a co-tenant's consent for a shared-dwelling search. The Court observed that "there is practical value in the simple clarity of complementary rules, one recognizing the co-tenant's permission when there is no fellow occupant on hand, the other according

dispositive weight to the fellow occupant's contrary indication when he expresses it." *Id.* at 121–22.

¶ 5.   As other courts have recognized, the "simple clarity" of those rules is lost if the requirement that the resident is "physically present" is not actually applied. While the Ninth Circuit Court of Appeals has endorsed a more flexible application of the *Randolph* rule,[2] we are persuaded that the better approach is the one taken by the federal circuit courts that focus on the rule's requirements for an express objection while the objecting co-tenant is physically present with the police at the dwelling's threshold. For example, the Seventh Circuit Court of Appeals stated, "[W]e see the contemporaneous presence of the objecting and consenting cotenants as indispensible to the decision in *Randolph*." *United States v. Henderson*, 536 F.3d 776, 783 (7th Cir. 2008). Considering these requirements, the court deemed a tenant "absent" where the tenant had expressly objected to a search while on the scene and had been arrested and jailed. *Id.* at 777. The *Henderson* court held that "[a tenant's] objection is not enough if he is absent from the later entry by authorities with the voluntary consent of his cotenant." *Id.* at 784. The Eighth Circuit Court of Appeals held that "this ['social custom'] rationale for the narrow holding of *Randolph*, which repeatedly referenced the defendant's physical presence *and* immediate objection, [is] inapplicable" where the objecting co-tenant "was not present because he had been lawfully arrested." *United States v. Hudspeth*, 518 F.3d 954, 960 (8th Cir. 2007).

[2] The Ninth Circuit Court of Appeals held a warrantless search unconstitutional under *Randolph* where a search was conducted after a defendant "refused consent and was subsequently arrested and removed from the scene." *United States v. Murphy*, 516 F.3d 1117, 1124 (9th Cir. 2008).

¶ 6. The question then is whether a resident seated in a nearby vehicle is "physically present" such that his express refusal to consent would bar a warrantless search notwithstanding the consent given by a co-tenant. We are persuaded that *Randolph* is to be construed narrowly. Although the language therein explaining the holding is very helpful, the rule stated in *Randolph* does not apply in this case because we conclude that St. Martin was not physically present at what the United States Supreme Court called the "threshold colloquy." *Randolph*, 547 U.S. at 121. This case closely resembles the facts presented in the *Matlock* case. The consent given by St. Martin's co-tenant was valid, and as in the *Matlock* case, that consent rendered the search constitutionally permissible because it cannot be trumped by an objection from an absent tenant. The cocaine and currency seized in the initial search of the attic is therefore admissible evidence. Having resolved that question, we merely note that there is no reason to exclude that evidence from consideration by the Racine County Circuit Court, which subsequently issued a warrant for a second search. As a different branch of the circuit court later found after hearing St. Martin's motion to suppress the evidence, portions of the search warrant affidavit had contained inaccurate statements, and the circuit court correctly proceeded to evaluate the affidavit to determine whether the untainted information alone would have established probable cause to issue a search warrant.[3] With the addition of the fruits of the first search,

[3] *State v. O'Brien*, 70 Wis. 2d 414, 424, 234 N.W.2d 362 (1975) (where a search warrant is issued based on both tainted and untainted evidence, a reviewing court "independently can determine that the [untainted evidence was] sufficient to support a finding of probable cause to issue the search warrant...").

the affidavit's sufficiency cannot be questioned. There is therefore no basis on which to suppress the scale, currency, cell phones and documents seized in the second search.[4]

¶ 7. We therefore answer the certified question by holding that the rule regarding consent to search a shared dwelling in *Randolph* does not apply in these circumstances to bar a warrantless search, given that there is no allegation or evidence that the removal of St. Martin from the apartment was pretextual. Our holding that the first search was constitutional has the effect of putting beyond question the sufficiency of the affidavit for the warrant and the resulting evidence gained in the second search. We affirm the judgment and the order of the circuit court denying St. Martin's post-conviction motion.

## I. BACKGROUND

¶ 8. St. Martin's girlfriend, Latoya M. (Latoya), arrived at the police department at 11:30 p.m. on June

---

*See also United States v. Karo*, 468 U.S. 705, 721 (1984) (where sufficient untainted evidence is presented in the warrant affidavit to establish probable cause, the warrant is valid) and *Franks v. Delaware*, 438 U.S. 154, 156 (1978) (stating that a search warrant must be voided and seized evidence excluded where "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause . . . .").

[4] The circuit court that reviewed the affidavit for the search warrant agreed with the state that the warrantless search had been improper; however, our answer to the certified question means that the warrantless search was constitutionally sound; therefore, the evidence seized in it was properly considered in the search warrant affidavit. There is no dispute that if the cocaine evidence were properly included, the affidavit would establish probable cause for a search warrant to be issued.

8, 2006, and asked to speak to an officer. She told the officer she had been battered by St. Martin, with whom she shared an apartment. She described being hit in the face and head and having her head slammed down on the headboard of the bed, and said that when St. Martin allowed her to leave the apartment, she had come directly to the police. While she was at the station, she also told police she suspected that St. Martin was selling cocaine. Specifically, she mentioned that about six days earlier, she had walked into the bathroom and had seen him with what looked like cocaine in a plastic sandwich bag. She said that before that occurred, St. Martin had asked her if she had taken something of his, which she denied; she said he had eventually told her he had found the lost item and that it was a "kilo." She also said she suspected he hid cocaine in their apartment's attic because she had seen him go up there.

¶ 9. Latoya showed officers a driver's license that gave an address that matched the apartment address, and she agreed to go back to the apartment with the police. When they arrived at the apartment, they knocked and got no answer. Latoya used her key to let police into St. Martin's residence. St. Martin was standing near the door when police opened it, and he said nothing in objection to their entry. Once police entered, they took St. Martin into custody based on the allegation of assault and took him out to a police van. He was then placed under arrest. After St. Martin was taken outside, the officers asked Latoya for her consent to search the attic where she had said that drugs might be hidden. Latoya consented to the search of the attic. Officers then went outside to the police vehicle and asked St. Martin for his consent to search the residence. He refused.

¶ 10.   After obtaining Latoya's consent, the officers accompanied her to the attic and searched the attic. One officer noticed money sticking out from under some clothes, moved the clothes, saw two bags with what looked like cocaine, and seized the bags and the money. Chemical tests showed that the substance was cocaine.

¶ 11.   The officers who spoke with Latoya relayed what she had told them to a drug investigator who immediately drafted an affidavit in support of a search warrant for a second search. This warrant contained some inaccurate statements regarding what Latoya had told police. The statements attributed to her included some statements that indicated she had knowledge about St. Martin "regularly" and "often" having drugs at the apartment. The circuit court later found that Latoya had not made those statements. The affidavit also stated that police had seized a large amount of cocaine as a result of the initial search.

¶ 12.   In the initial, warrantless search, police had seized cash and bags of cocaine. In the second search conducted after police obtained a warrant, police had seized cash, a scale, cell phones and documents. St. Martin moved to suppress the evidence seized in both searches.

¶ 13.   St. Martin argued that the evidence seized in the first search should be suppressed because police did not have valid consent to search his apartment without a warrant. He argued that the evidence seized in the second search should be suppressed because the warrant was invalid because it was based on an affidavit that referenced the cocaine seized in the first search and that included the inaccurate statements.[5]

---

[5] "Evidence obtained as a direct result of an unconstitutional search or seizure is plainly subject to exclusion." *Segura v. United States*, 468 U.S. 796, 804 (1984).

¶ 14. The State conceded at the circuit court that the pre-warrant search was improper[6] but argued that the evidence gathered in the initial search was still admissible under the independent source doctrine because the subsequently issued warrant would have been an independent source of the evidence.[7] It argued that the warrant was valid notwithstanding the reference to the evidence seized in the warrantless search and the inaccurate statements provided to obtain it. It argued that there was a sufficient basis to establish probable cause for the warrant even if the inaccurate information was redacted. In other words, it argued that all of the evidence seized in both searches was admissible because there were sufficient facts in evidence even omitting the tainted evidence for the warrant to have been validly issued. It argued that the warrant was valid and would have served as an independent source for the discovery of the evidence in the apartment attic.

[6] This court is of course "not bound by the parties' interpretation of the law or obligated to accept a party's concession of law." *State v. Carter,* 2010 WI 77, ¶ 50, 327 Wis. 2d 1, 21, 785 N.W.2d 516 (citing *Bergmann v. McCaughtry,* 211 Wis. 2d 1, 7, 564 N.W.2d 712 (1997)).

[7] "In [*Murray v. United States*], the [United States] Supreme Court held that evidence initially discovered during an illegal search, but subsequently acquired through an independent and lawful source, is admissible." *State v. Lange,* 158 Wis. 2d 609, 624, 463 N.W.2d 390 (Ct. App. 1990). The State acknowledges in its brief to this court that "no direct testimony was taken on either prong of *Murray*'s two-part test for the independent source doctrine: whether Investigator Sorenson would have sought either warrant had the illegal entry not been made; or whether the information obtained in the attic search affected the magistrate's decision to issue either warrant." Resp. Br. at 40. The independent source doctrine does not come into play here, and we need not consider it further.

¶ 15. After a hearing, the circuit court concluded that the affidavit in support of the search warrant did contain inaccurate statements but that police did not intentionally falsify the affidavit. The circuit court denied St. Martin's motion to suppress. The circuit court held, with no opposition from the State, that the first search was illegal because St. Martin had "specifically not consented to the search." However, the court held that a redacted version of the affidavit, including only the accurate representations of Latoya's statements made to the police, would have provided sufficient probable cause for the issuance of the warrant; and the motion to suppress was denied as to all evidence from both searches.[8] St. Martin pleaded guilty, was convicted, and appealed the court's order denying his motion to

---

[8] The record does not state with specificity under which doctrine the circuit court would have found the first search's evidence admissible; it can be inferred from the motion hearing transcript and the decision that the court considered that the evidence seized in the warrantless search would have come in under the inevitable discovery doctrine and the evidence from the second search would have come in because the warrant was deemed valid. We note that under our analysis, the evidence seized in the warrantless search is admissible because it was seized in a valid consent search; the subsequently issued warrant is not the basis for its admissibility, and neither the inevitable discovery doctrine nor the independent source doctrine come into play. *See Nix v. Williams,* 467 U.S. 431, 434 (1984)(fruits of an illegal search nonetheless may be admitted if the evidence "ultimately or inevitably [would] have been discovered even if no violation of any constitutional or statutory provision had taken place") and *State v. Schwegler,* 170 Wis. 2d 487, 499–500, 490 N.W.2d 292 (Ct. App. 1992) ("The proponent of the doctrine must show by a preponderance of the evidence that the tainted fruits inevitably would have been discovered by lawful means.").

suppress evidence.[9] The court of appeals certified the question above to this court and this court accepted the certification.

## II. STANDARD OF REVIEW AND PRINCIPLES OF LAW

■■

¶ 16. The following principles govern our review of a constitutional challenge to a search and our review of the sufficiency of an affidavit for a search warrant, both of which are presented in this case. "Whether police conduct has violated the constitutional guarantees against unreasonable searches and seizures is a question of constitutional fact." *State v. Tomlinson*, 2002 WI 91, ¶ 19, 254 Wis. 2d 502, 648 N.W.2d 367. While deferring to the circuit court's findings of evidentiary and historical fact, "we independently apply those historical facts to the constitutional standard." *Id.*

> In deciding whether probable cause exists for the issuance of a search warrant, the reviewing court examines the totality of the circumstances presented to the warrant-issuing commissioner to determine whether the warrant-issuing commissioner had a substantial basis for concluding that there was a fair probability that a search of the specified premises would uncover evidence of wrongdoing.

*State v. Romero*, 2009 WI 32, ¶ 3, 317 Wis. 2d 12, 765 N.W.2d 756. The standard of review for a challenge to

---

[9] Wis. Stat. § 971.31(10) states, "An order denying a motion to suppress evidence or a motion challenging the admissibility of a statement of a defendant may be reviewed upon appeal from a final judgment or order notwithstanding the fact that the judgment or order was entered upon a plea of guilty or no contest to the information or criminal complaint."

302

the issuance of a search warrant has been stated by this court as follows:

> [T]his court must determine whether the magistrate was apprised of sufficient facts to excite an honest belief in a reasonable mind that the object sought is linked with the commission of a crime. The magistrate's finding must stand unless the proof is clearly insufficient. This review is necessarily limited to the facts before the magistrate. The evidence necessary for a finding of probable cause is less than that required at a preliminary examination or for a conviction. Although the finding cannot be based on the affiant's suspicions and conclusions, the magistrate may make the usual inferences reasonable persons would draw from the facts presented.

*Bast v. State,* 87 Wis. 2d 689, 692–93, 275 N.W.2d 682 (1979) (internal citations omitted).

¶ 17. In this case, we review an affidavit that the circuit court found to contain both tainted and untainted evidence.

> The United States Supreme Court has held that where there is sufficient untainted evidence presented in the warrant affidavit to establish probable cause, the warrant is valid. Similarly, in *State v. O'Brien,* where a search warrant was issued based on both tainted and untainted evidence, [the] supreme court held that it could independently 'determine that the [untainted evidence was] sufficient to support a finding of probable cause to issue the search warrant for a search of the entire [premises].'

*State v. Herrmann,* 2000 WI App 38, ¶ 21, 233 Wis. 2d 135, 608 N.W.2d 406 (internal citations omitted).

303

## III. ANALYSIS

¶ 18. The question certified to this court is whether the rule set forth in *Randolph* applies under the circumstances of this case. St. Martin argues that the *Randolph* rule does apply and argues that all evidence and information obtained in both the first search and the second search must be suppressed because the first search was a warrantless search to which he expressly objected, and the second search was authorized by a warrant that was obtained based on false statements and illegally gained evidence. The State asserts that *Randolph* does not apply because it is factually distinguishable; instead, the State argues, it is *Matlock* that sets forth the applicable rule.[10]

**[3–5]**

¶ 19. As noted above, there are certain principles that govern an analysis of a claimed Fourth Amendment violation. First, search by consent is an established exception to the general requirement for a war-

---

[10] The State advances a series of additional arguments in the alternative; because we answer the certified question by holding that *Matlock* applies and that *Randolph* is properly read narrowly, we need not address each of the State's arguments in the alternative. In addition, St. Martin raises, but does not really develop, an argument that Latoya's consent was not valid because she was not a co-occupant. This argument lacks any merit. Third-party consent is valid, assuming no present objection, if given by a co-occupant with "actual or apparent authority" over the residence, which may be shown by facts including: (1) "possession of a key"; (2) the third-party's admission that she lives there; and (3) "possession of a driver's license listing the residence as the driver's legal address." *United States v. Groves*, 530 F.3d 506, 509 (7th Cir. 2008). All of these facts were present in this case, and thus Latoya was authorized to give consent to search. St. Martin has cited no authority to the contrary.

rant, a requirement rooted in the Fourth Amendment to the United States Constitution and the corollary provision in the Wisconsin Constitution.[11] Consent searches are "a constitutionally permissible and wholly legitimate aspect of effective police activity." *Schneckloth v. Bustamonte,* 412 U.S. 218, 228 (1973). Second, the State bears the burden of proving, by clear and convincing evidence, "that a warrantless search was reasonable and in compliance with the Fourth Amendment." *State v. Kieffer,* 217 Wis. 2d 531, 541–42, 577 N.W.2d 352 (1998). Third, within the so-called "shared dwelling" category of warrantless consent searches, the United States Supreme Court has spelled out how to proceed when there is not unanimous consent. It has said that "the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." *Matlock,* 415 U.S. at 170. It has further stated that a "physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant." *Randolph,* 547 U.S. at 122. As applied to cases, the interaction of these rules can appear formalistic, as the United States Supreme Court has acknowledged. It has

---

[11] The Fourth Amendment to the United States Constitution states that people have the right "to be secure in their persons, houses, papers, and effects" from "unreasonable searches and seizures" and that probable cause is required for a warrant to be issued. Article I, sec. 11 of the Wisconsin Constitution provides as follows: "Searches and seizures. SECTION 11. The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized."

recognized the "fine line" drawn in shared-dwelling consent cases and has stated that "the formalism is justified." *Randolph*, 547 U.S. at 121. It is helpful that the Court has made that point clear because this is a case where it comes down to applying the rule set forth in *Randolph* with such justified formalism.

¶ 20.   We have already set forth the parties' essential arguments. St. Martin argues that the evidence seized in the first search must be suppressed because under *Randolph*, his objection to the search from nearby trumps the consent granted by a co-tenant and renders a warrantless search illegal. The State argues that *Randolph* does not govern here because St. Martin was not physically present in the apartment when he objected to the search of the attic.

¶ 21.   When we are in territory where fine lines are drawn and the law is unapologetically formalistic, we must look at the facts as they have been found by the circuit court and accept that small differences often become dispositive. The decision here turns on where this case falls in relation to the fine line drawn by the United States Supreme Court in *Randolph*.[12] St. Martin was "a potential defendant with self-interest in objecting [to a search]." *Randolph*, 547 U.S. at 121. If he was

---

[12] Justice Bradley accuses the majority of "sidestep[ping] *Randolph's* holding" and "handpick[ing] the language from *Randolph*" that supports a narrow reading of the case. Dissent, ¶ 48. Naturally, we focus on the language that seems to us most significant to the resolution of this particular case, and Justice Bradley does the same; we disagree about which language that is. As to the implication that the majority "advance[s] a more restrictive interpretation of the federal constitution" than the United States Supreme Court's, Dissent, ¶ 54, we note that other courts likewise bound by United States Supreme Court precedent have also read *Randolph* narrowly, as we do. *See infra*, ¶ 25.

"in fact at the door and object[ing]," Latoya's consent was not sufficient for a consent search of the apartment. If he was "nearby but not invited to take part in the threshold colloquy," the United States Supreme Court has said, he "loses out." *Id.*

¶ 22.   The facts as found by the circuit court[13] are that St. Martin was in the house when the police arrived. He did not expressly object to their entry as he stood at the door. He was taken into custody. There was no evidence that taking St. Martin into custody was a pretext to remove him from the premises so that police could search for the cocaine. He was detained and arrested validly in response to an alleged battery. (St. Martin does not dispute that the arrest was valid, nor does he allege that his removal from the apartment was pretextual.) Latoya had a driver's license showing the apartment's address and had possession of a key. She was in the apartment when she consented to the search of the attic. St. Martin had left the apartment in the custody of the police, and was inside a police vehicle when police asked him for consent. He expressly refused to consent, and the police searched the attic anyway.

¶ 23.   St. Martin was clearly not "at the door and objecting." In fact, when he was "at the door" and the police entered, he did not object. As St. Martin noted in his motion to the circuit court, "One difference between *Randolph* and St. Martin's case is that St. Martin was absent at the time of [Latoya's] consent." It is undisputed that St. Martin was "nearby."

---

[13] Because we decide only the case before us and do not speculate about the application of this holding to the facts of other cases, the dissent's consideration of various hypothetical fact patterns, Dissent, ¶¶ 49–50, is not useful to the analysis.

¶ 24. We next turn to whether he was "invited to take part in the threshold colloquy," a point disputed by the parties. St. Martin argues that he was invited to take part because the officer came to him and asked for his consent. The State argues that the "threshold colloquy" referenced by the Court in *Randolph* cannot be rightly construed to include a colloquy that occurs outside the home.

¶ 25. We have considered the decisions by other courts that have examined and applied *Randolph*. We find persuasive the careful analysis conducted by the Seventh and Eighth Circuit courts of appeals. Those courts have held that the *Randolph* Court made clear its intention that its holding be applied in narrow terms. The Seventh Circuit so held in a case with significant similarity to the one before us. In *Henderson*, the defendant had been at his home when the police arrived in response to a report of domestic violence. *Henderson*, 536 F.3d at 777. *Henderson* met the police at the threshold and, in "unequivocal terms," refused consent to their presence in his home. *Id.* He was arrested for battery and taken to jail. *Id.* Immediately thereafter, the police searched his house, having obtained a signed consent-to-search form from his wife. *Id.* In holding that "both presence *and* objection by the tenant are required to render a consent search unreasonable" as to a nonconsenting co-tenant, the court noted,

> In *United States v. Hudspeth*, 518 F.3d 954 (8th Cir. 2008), an en banc majority of the Eighth Circuit determined that *Randolph*'s holding is case specific and extends no further than its particular facts.
>
> . . . *Randolph* itself, we observed in *Groves,* "expressly disinvites" any reading broader than its specific facts.

308

> Like the Eighth Circuit, we see the contemporaneous presence of the objecting and consenting cotenants as indispensable to the decision in *Randolph*.

*Henderson*, 536 F.3d at 781–83.

¶ 26. In *Hudspeth*, the situation was similar. The defendant had told police that he had "downloaded the [child pornography] images from the internet" onto his computer at work, and police had found the images on that computer. *Hudspeth*, 518 F.3d at 955. Officers asked to search his home computer, and he refused to consent. *Id.* Hudspeth was arrested and taken to jail, and officers went to his home, where they spoke with his wife and ultimately obtained her consent for a search of the home computer without informing her of his earlier refusal. *Id.* The Eighth Circuit first noted that the *Randolph* majority "consistently repeated it was Randolph's *physical presence* and *immediate objection* to Mrs. Randolph's consent that distinguished *Randolph* from prior case law," which the Court "reinforced . . . in its conclusion" with a focus on *"the express refusal of consent by a physically present resident." Id.* at 959. The Eighth Circuit then turned to application of the rule to the facts:

> [U]nlike *Randolph*, the officers in the present case were not confronted with a "social custom" dilemma, where two physically present co-tenants have contemporaneous competing interests and one consents to a search, while the other objects. Instead, when [the officer] asked for Mrs. Hudspeth's consent, Hudspeth was not present because he had been lawfully arrested and jailed based on evidence obtained wholly apart from the evidence sought on the home computer. Thus, this rationale for the narrow holding of *Randolph*, which repeatedly referenced the defendant's physical presence and immediate objection, is inapplicable here.

*Hudspeth*, 518 F.3d at 960.

309

¶ 27. We agree with those courts that the *Randolph* Court incorporated an express requirement of physical presence in its shared-dwelling consent rule. An approach that reads the phrase "threshold colloquy" metaphorically would not be consistent with either the "physically present" requirement or the "fine line" framework set forth by the United States Supreme Court. Such an approach cannot be reconciled with the clear statement of the Court that minor factual differences will be dispositive. The Seventh Circuit's analysis in *Henderson* noted that the *Randolph* concurrence by Justice Breyer stressed the fact-intensive nature of the analysis in this type of case. *See Henderson,* 536 F.3d at 781 (citing *Randolph,* 547 U.S. at 127 (Breyer, J., concurring)). In cases where the United States Supreme Court has drawn what it acknowledges are fine lines, the facts matter, and slight factual differences may take the analysis in far different directions. The argument that a slight variation in the facts would require an opposite result is therefore not persuasive. Slight differences in facts do actually often make a difference. We therefore agree with the State that under the justified formalism of the rules set forth by the United States Supreme Court, St. Martin was "nearby" and "not invited to take part in the threshold colloquy," and that he therefore does not fall within the rule stated in *Randolph* such that the search should have been barred and the evidence gained from it suppressed.

¶ 28. Having addressed the certified question, we briefly turn to the second category of evidence at issue in this case, the evidence seized in the second search. As noted above, that search was conducted pursuant to a warrant. If the warrant was defective, as St. Martin

310

argues, the items seized in that search would have to be excluded.[14]

¶ 29.   There are two grounds on which St. Martin attacks the validity of the warrant. The first basis for the challenge is that the affidavit used in support of the warrant application contained reference to the cocaine seized in the initial search, which St. Martin had challenged as illegal. We have determined that there was no constitutional violation as to the initial search, so the consideration of that evidence constitutes no flaw. As St. Martin's counsel acknowledged before the circuit court during his challenge to the validity of the warrant, if the initial search was constitutionally valid and there was no bar to the consideration of the cocaine seized in that search, there would be no basis on which to challenge the warrant. That analysis is correct.

¶ 30.   The second basis for the challenge is that the affidavit contained both tainted and untainted evidence. As noted above, the inclusion of tainted evidence in an affidavit does not alone invalidate the warrant issued. *See O'Brien,* 70 Wis. 2d at 424 (where a search warrant is issued based on both tainted and untainted evidence, this court can independently "determine that the [untainted evidence was] sufficient to support a finding of probable cause to issue the search

[14] Because the validity of the warrant is relevant only to the admissibility of the evidence seized in the second search, and not to the evidence seized in the first one, we need not address the arguments concerning the inevitable discovery doctrine and the independent source doctrine; they do not come into play. As noted previously, our holding that the initial search was a valid consent search makes it unnecessary to consider alternative theories on which the evidence seized in that search could be admitted.

warrant . . . ."). *See also Karo,* 468 U.S. at 719 (where sufficient untainted evidence is presented in the warrant affidavit to establish probable cause, the warrant is valid) and *Franks,* 438 U.S. at 156 (stating that a search warrant must be voided and evidence seized excluded where "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause . . . ."). The circuit court heard testimony concerning the tainted evidence provided in the affidavit and made the following findings[15]:

> Paragraph 4 of the search warrant states as follows:
>
> ["]That your affiant states that Officer A. Matsen was approached by [Latoya] after St. Martin was in custody. [Latoya] told A. Matsen that St. Martin *regularly* has large amounts of cocaine in the apartment and that he *regularly* brings kilograms of cocaine into the apartment, where he would divide it up into smaller pieces and rebags [sic] it into smaller bags *for resale.* [Latoya] further stated that St. Martin *often* hides that cocaine in the attic.["]
>
> As noted at the close of the evidentiary portion of the hearing, those statements were not true.

(Emphasis added.)

---

[15] The affidavit also contains reference to the cocaine seized in the initial search. In considering St. Martin's challenge to the warrant, the circuit court excised the reference to the cocaine, noting, "The statements [by the officers] were made after they had discovered a large amount of cocaine in the attic. Unfortunately, as conceded by both the State and argued by the Defense, the search of the attic was illegal because Mr. St. Martin had specifically not consented to the search." The circuit court therefore evaluated the sufficiency of the affidavit without consideration of that evidence, whereas we have held that the initial search was proper and that the cocaine found did not have to be excluded from consideration.

The circuit court then redacted the inaccuracies (which mainly consisted of exaggerating the number of times Latoya had seen St. Martin with cocaine) from the fourth paragraph of the affidavit based on the testimony and findings of fact, arriving at the following version:

> "That your affiant states that Officer A. Matsen was approached by [Latoya] after St. Martin was in custody. [Latoya] told A. Matsen that St. Martin may have cocaine in the apartment. That she had seen St. Martin divide cocaine into smaller pieces and rebag it into smaller bags. [Latoya] further stated that St. Martin may hide cocaine in the attic."

Given that information, the circuit court held that the affidavit's untainted evidence still established probable cause for a search of the attic. Restoring the discovered cocaine to that affidavit, as our holding would do, merely strengthens the circuit court's basis for the conclusion that the affidavit was sufficient, that the warrant was valid, and that the evidence from the second search should not be suppressed.

## IV. CONCLUSION

¶ 31.  The question then is whether a resident seated in a nearby vehicle is "physically present" such that his express refusal to consent would bar a warrantless search notwithstanding the consent given by a co-tenant. We are persuaded that *Randolph* is to be construed narrowly. Although the language therein explaining the holding is very helpful, the rule stated in *Randolph* does not apply in this case because we conclude that St. Martin was not physically present at what the United States Supreme Court called the "threshold colloquy." *Randolph,* 547 U.S. at 121. This case closely resembles the facts presented in the *Matlock* case. The

313

consent given by St. Martin's co-tenant was valid, and as in the *Matlock* case, that consent rendered the search constitutionally permissible because it cannot be trumped by an objection from an absent tenant. The cocaine and currency seized in the initial search of the attic is therefore admissible evidence. Having resolved that question, we merely note that there is no reason to exclude that seizure from consideration by a different branch of the Racine County Circuit Court, which subsequently issued a warrant for a second search. As the circuit court later found, portions of the search warrant affidavit had contained inaccurate statements, and the circuit court correctly proceeded to evaluate the affidavit to determine whether the untainted information alone would have established probable cause to issue a search warrant. With the addition of the fruits of the first search, the affidavit's sufficiency cannot be questioned. There is therefore no basis on which to suppress the scale, currency, cell phones and documents seized in the second search.

¶ 32.   We therefore answer the certified question by holding that the rule regarding consent to search a shared dwelling in *Randolph* does not apply in these circumstances to bar a warrantless search, given that there is no allegation or evidence that the removal of St. Martin from the apartment was pretextual. Our holding that the first search was constitutional has the effect of putting beyond question the sufficiency of the affidavit for the warrant, and the resulting evidence gained in the second search. We affirm the judgment and the order of the circuit court denying St. Martin's post-conviction motion.

*By the Court.*—Certified question from the court of appeals answered and judgment and order of the Circuit Court for Racine County affirmed.

¶ 33. ANN WALSH BRADLEY, J. (*dissenting*). In *Georgia v. Randolph*,[1] the United States Supreme Court set forth a rule governing circumstances in which one inhabitant consents to a search and another inhabitant objects. The Court held that "a physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant." 547 U.S. 103, 122–23 (2006).

¶ 34.   The majority appears, at times, to construe "physically present" to mean that the objecting inhabitant must be standing squarely under the doorframe when he registers his objection to the search. To the extent that the majority limits the holding from *Randolph*, it endorses a test that will yield arbitrary results and impermissibly affords citizens fewer Fourth Amendment protections than does the United States Supreme Court.

¶ 35.   Contrary to the majority, I conclude that this case falls squarely within the rule enunciated in *Randolph*. Because I determine that St. Martin was physically present when he refused to consent to the search, I respectfully dissent.

I

¶ 36.   In its certification memorandum, the court of appeals asked whether the rule from *Randolph* applies when "a physically present resident is taken forcibly from his residence by law enforcement officers but remains in close physical proximity to the residence[.]" Majority op., ¶ 2. The State argues that a defendant is not physically present when he is "outside the home." *Id.*, ¶ 24. At times, the majority embraces the dictates of

---

[1] *Georgia v. Randolph*, 547 U.S. 103 (2006).

*Randolph* and concludes that the dispositive question is whether the defendant was "physically present at the residence." *Id.*, ¶ 2.

¶ 37.   When applying the rule, however, the majority appears to conclude that "physically present" means that the defendant must be standing under the doorframe of the residence when he lodges his objection. It notes that St. Martin "did not expressly object to [the officers'] entry as he stood at the door," *id.*, ¶ 22, and that when St. Martin refused to consent to the search, he was "not at the door and objecting," *id.*, ¶ 23. Therefore, it concludes that "St. Martin was not physically present at what the United States Supreme Court called the 'threshold colloquy.'" *Id.*, ¶ 6. Even though St. Martin was on hand and registered an express, contemporaneous objection to the search, the majority determines that he was "absent" and that "the rule stated in *Randolph* does not apply in this case." *Id.*, ¶ 6.

II

¶ 38.   "The physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585–86 (1980). Warrantless searches of homes are presumptively unreasonable. *Welsh v. Wisconsin*, 466 U.S. 740, 748–49 (1984).

¶ 39.   There are several recognized exceptions to the warrant requirement. These "narrow and well-delineated" exceptions are to be "jealously and carefully drawn," and the State bears the burden of proving by clear and convincing evidence that any warrantless search was reasonable and in compliance with the Fourth Amendment. *Flippo v. W. Virginia*, 528 U.S. 11, 13 (1999); *Jones v. United States*, 357 U.S. 493, 499

316

(1958); *State v. Kieffer,* 217 Wis. 2d 531, 541–42, 577 N.W.2d 352 (1998). The rationale for construing exceptions narrowly is that "the informed and deliberate determinations of magistrates empowered to issue warrants as to what searches and seizures are permissible under the Constitution are to be preferred over the hurried action of officers." *Randolph,* 547 U.S. at 117 (quoting *United States v. Lefkowitz,* 285 U.S. 452, 464 (1932)).

¶ 40.    The voluntary consent of the occupant of a home is one exception to the warrant requirement. In *United States v. Matlock,* 415 U.S. 164 (1974), the Supreme Court held that "the consent of one who possesses common authority over premises . . . is valid as against the absent, nonconsenting person with whom that authority is shared." *Id.* at 170.

¶ 41.    This holding was recently reexamined by the Supreme Court in *Georgia v. Randolph,* 547 U.S. 103. In that case, the defendant's wife consented to a search of their home. The defendant, who later sought to suppress the evidence, met the officers at the door and expressly objected to the search.

¶ 42.    In keeping with the principle that exceptions to the warrant requirement are construed narrowly to protect the privacy of the home, the Court held that "a physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant." 547 U.S. at 122–23. It explained that the cooperative occupant's "disputed invitation, without more, gives a police officer no better claim to reasonableness in entering than the officer would have in the absence of any consent at all." *Id.* at 114.

¶ 43.    When applying its holding to the facts of the case before it, the Court noted that Randolph was "at

the door" when he expressed his objection to the search. It explained that "if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out." *Id.* at 121.

¶ 44.    When setting forth the question presented and its holding, however, the Court's language clarifies that the defendant need not be at the door to be deemed physically present. The Court explained that the question presented was whether a search was lawful when a resident "*is present at the scene* and expressly refuses to consent." *Id.* at 106 (emphasis added). Later, the Court differentiated between residents who are "on hand" and those who are "absent." *Id.* at 121–22.

¶ 45.    The rule set forth in *Randolph* appears to be motivated by the concern that officers need not "take affirmative steps to find a potentially objecting co-tenant." *Id.* at 122. Retaining the *Matlock* rule regarding "absent" co-tenants, the Court concluded that "it would needlessly limit the capacity of the police . . . if we were to hold that reasonableness required the police to take affirmative steps to find a potentially objecting co-tenant before acting on the permission they had already received." *Id.* at 122.

¶ 46.    A different situation is presented when the co-tenant is "present at the scene" and "expressly refuses consent." *Id.* at 106. In such a case, "[d]isputed permission is [] no match for [the] central value of the Fourth Amendment," and "the cooperative occupant's invitation adds nothing to the government's side to counter the force of an objecting individual's claim to security against the government's intrusion into his dwelling place." *Id.* at 115.

¶ 47. In so concluding, the *Randolph* Court emphasized that "there is practical value in the simple clarity of complementary rules[.]" *Id.* at 121. One rule "recogniz[es] the co-tenant's permission when there is no fellow occupant on hand, the other accord[s] dispositive weight to the fellow occupant's contrary indication when he expresses it." *Id.* at 121–22.

## III

¶ 48. In making the determination that St. Martin was not physically present, the majority sidesteps *Randolph's* holding. Instead, it handpicks the language from *Randolph* where the Court was applying its rule to the particular facts of the case.

¶ 49. Under the majority's analysis, it is unclear how close a nonconsenting occupant must be to the front door to be considered "physically present." The majority notes that St. Martin "did not expressly object to [the officers'] entry as he stood at the door," majority op., ¶ 22, and that when St. Martin did object, he was "not at the door and objecting." *Id.*, ¶ 23. Neither the court of appeals nor the State advances such a restrictive rule. Both acknowledge that the test is whether the defendant is "physically present." *See supra,* ¶ 36.

¶ 50. A straightforward application of the majority's apparent holding would lead to arbitrary results. What if the nonconsenting occupant is standing just beyond the doorframe when he objects to the search? What if he is 10 feet away? What if he is at the bottom of the stairs leading up to the door? Does it make any difference if he is standing on the second step beyond the entryway, or on the fifth? To negate his co-occupant's consent, must the nonconsenting occupant stand squarely under the doorframe of his resi-

dence and block the officers' entry as he lodges his objection?

¶ 51. If the majority's rule is applied literally, the reasonableness of officers' actions will not be judged by any common understanding of what is reasonable. Rather, the officers' actions will instead be judged by metaphysical determinations about the precise contours of the boundary of the "threshold" of a home. This cannot possibly be the "formalism" envisioned by the *Randolph* Court when it explained that "there is practical value in the simple clarity of complementary rules." Much simpler is a rule that recognizes the objection of a resident who is "on hand" and "at the scene" when he refuses to consent to the search of his private residence.

¶ 52. In drawing the "fine line" that a co-occupant's objection loses validity past the threshold, the majority expands the consent exception to the warrant requirement and undercuts the requirement that searches be reasonable. It is exceptions to the warrant requirement, rather than exceptions to the exceptions to the warrant requirement, that must be construed narrowly. *See Flippo,* 528 U.S. at 13.

¶ 53. I recognize that lower courts have split on whether *Randolph* should be given a broad or a narrow interpretation.[2] However, if the majority opinion is construed to hold that a defendant must be standing squarely under the doorframe for his objection to have any weight, the majority interprets the Federal Constitution to provide fewer rights than the interpretation

___

[2] *See, e.g.,* Marc McAllister, *What the High Court Giveth the Lower Courts Taketh Away,* 56 Clev. St. L. Rev. 663 (2008); Note, Renee E. Williams, *Third Party Consent Searches After Georgia v. Randolph: Dueling Approaches to the Dueling Roommates,* 87 B.U. L. Rev. 937 (2007).

320

adopted by the United States Supreme Court. This, the majority may not do.

¶ 54. State courts are bound by the United States Supreme Court's interpretation of the Federal Constitution. *Chapman v. California,* 386 U.S. 18, 21 (1967); *State v. Jennings,* 2002 WI 44, ¶ 18, 252 Wis. 2d 228, 647 N.W.2d 142. A state court may interpret its own constitution to provide greater protection than the Federal Constitution. *Cooper v. California,* 386 U.S. 58, 62 (1967). However, a state court may not advance a more restrictive interpretation of the Federal Constitution than the interpretation adopted by the United States Supreme Court. *Id.*

## IV

¶ 55. Contrary to the majority, I conclude that the facts of this case fit squarely within the rule enunciated in *Randolph.* St. Martin and Latoya shared an apartment. According to an officer's testimony, Latoya consented to a search of the attic.[3] St. Martin, who was

---

[3] From the record, it is not clear that Latoya actually consented to the search. Initially, the State advanced no argument that the search was valid pursuant to her consent. Rather, the State conceded that the search was illegal:

> The Court: [Y]ou would agree that prior to [the application for a warrant] there was, in fact, a search of the attic?
>
> [District Attorney]: Yes.
>
> The Court: And you would also agree—you're conceding that search was improper?
>
> [District Attorney]: The search of the attic was improper.

Latoya testified at the suppression hearing, but she was not asked whether she had consented. The circuit court made no finding of fact regarding Latoya's purported consent. Rather, it found: "What occurred here, unfortunately, is [the detectives] . . . went to the premises, they appropriately detained Mr.

321

detained in a squad car that had not yet left the scene, expressly objected to the search.[4] The officers knew that St. Martin objected. Nevertheless, rather than attempting to secure a warrant, they ignored St. Martin's express objection and conducted a warrantless search of the attic.[5]

¶ 56.   Under these facts, I conclude that St. Martin was physically present when he expressly refused to

St. Martin. He did not give consent to search. In fact, he specifically said you can't search. [Latoya] made some statements . . . and then at that time they probably should have called the metro drug unit, had them involved. But instead they decided to conduct their own search."

[4] By determining that "[t]his case closely resembles the facts presented in the *Matlock* case," majority op., ¶ 6, the majority fails to account for an essential fact that distinguishes this case from *Matlock*. In *United States v. Matlock*, 415 U.S. 164, 166 (1974), the defendant did not register any objection to the search. By contrast, St. Martin, who was "on hand," expressly refused to consent to the search.

I recognize that the application of the law to this case might differ if St. Martin, who was detained in a nearby squad car, had not objected to the search. Under those circumstances, the facts would more closely mirror the facts presented in *Matlock*. As the majority asserts, "the facts matter, and slight factual differences may take the analysis in far different directions." Majority op., ¶ 27.

[5] There is no claim that any exigency justified the warrantless entry. *See Randolph*, 547 U.S. at 116 n.6. St. Martin had been lawfully arrested and secured in a squad car, and he would have had no opportunity to destroy any evidence that might be contained within the apartment. Nothing but the "hurried action of [the] officers" prevented them from seeking "the informed and deliberate determination[] of [a] magistrate[] empowered to issue warrants." *Randolph*, 547 U.S. 103, 117 (quoting *United States v. Lefkowitz*, 285 U.S. 452, 464 (1932)).

322

consent to the search.[6] Accordingly, I respectfully dissent.

¶ 57. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON joins this dissent.

---

[6] Additionally, I conclude that the untainted evidence, consisting primarily of Latoya's equivocal statements to the police, were insufficient on their own to establish probable cause for the second search of the attic.