UNITED STATES of America,
Plaintiff–Appellee,

v.

Duk Kyung KIM, Defendant–Appellant.

No. 96–50270.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 7, 1996.

Decided Feb. 7, 1997.

Carlton F. Gunn, Deputy Federal Public Defender, Los Angeles, CA, for defendant-appellant.

Lauren T. Nguyen, Assistant United States Attorney, Los Angeles, CA, for plaintiff-appellee.

Before: BRUNETTI, TROTT, and THOMAS, Circuit Judges.

BRUNETTI, Circuit Judge:

Duk Kyung Kim appeals his conviction for possession of stolen property from a foreign shipment, alleging that the district court erroneously refused to suppress evidence and that the evidence presented was both legally and factually insufficient to support the jury's guilty verdict. Specifically, he argues that: 1) the district court incorrectly held that his associate, Seon Yong Wee (the lessee of the storage locker where the stolen property was found) had actual and apparent authority to consent to the search of the storage locker; 2) the evidence was insufficient to support a finding that the property in the locker was in fact the property that was stolen; and 3) the evidence was insufficient to prove the property was in foreign commerce at the time it was stolen.

## I. Facts

In June, 1995, FBI Special Agent Emmanuel Ladsous's investigation of stolen foreign shipments led him to Seon Yong Wee. Wee told Agent Ladsous that he had rented units at the Public Storage Management ("PSM") facility in Glendale, California and that he believed that Kim, his associate, had placed a large number of stolen television sets and tools in the units.

Agent Ladsous asked Wee for permission to search the units and Wee consented. Wee directed Agent Ladsous and Los Angeles County Sheriff's Department Detective Richard Garcia to the facility. Wee also showed the agents lease agreements indicating that he had rented three units at PSM. The agreements indicated that other individuals, including Kim, also had access to the units. Wee did not have the keys to the units but agreed to allow the agents to cut off the locks in order to search the units. Officers contacted the fire department, which removed the locks.

At the time that he gave his consent, Wee also told Agent Ladsous that Kim had hired him to rent the storage units and to inventory merchandise. Agent Ladsous testified that he believed that Wee had authority to

consent to the search because the leases were in Wee's name and Kim was listed only as an additional person authorized to access the units. The Agent also learned that Wee had been the only individual present during the unloading of some of the allegedly stolen goods and that Wee had temporarily kept the keys to the storage units afterwards.

The agents found a large number of "Campbell and Hausfeld" pneumatic tools and fittings inside the storage units. Kim was subsequently arrested and charged with possession of stolen property from a foreign shipment pursuant to 18 U.S.C. § 659.

At trial, Kim filed a motion to suppress the evidence found at PSM, maintaining that Wee had neither apparent nor actual authority to consent to the FBI's search. The district court denied his motion, and Kim now appeals that ruling. He also appeals the jury's guilty verdict. Kim alleges that the evidence presented was both legally and factually insufficient to support his conviction. We affirm both the district court's decision to admit evidence and the jury's guilty verdict.

## II. Standard of Review for Authority to Consent.

### A. Determination of Appropriate Standard of Review

In the past decade, this Circuit has consistently declined to decide the appropriate standard of review for a district court's ruling on authority to consent to a search. *See, e.g., United States v. Dearing,* 9 F.3d 1428, 1429 n. 1 (9th Cir.1993) ("We have not decided the standard of review for apparent authority determinations."); *United States v. Welch,* 4 F.3d 761, 764 n. 4 (9th Cir.1993) (same); *United States v. Sealey,* 830 F.2d 1028, 1031 (9th Cir.1987) (same); *United States v. Hamilton,* 792 F.2d 837, 841 (9th Cir.1986) (same).

■ In lieu of providing a standard, we have repeatedly held that the standard of review did not effect our determination of the case at issue. *Dearing,* 9 F.3d at 1429 ("Whether we review de novo . . . or for clear error, our conclusion is the same."). As we have uniformly affirmed decisions regarding

authority to consent, the result has been to uphold the district court without delineating an appropriate standard. *See, e.g., Dearing,* 9 F.3d at 1429 n. 1; *United States v. Kelley,* 953 F.2d 562, 566 (9th Cir.1992); *Sealey,* 830 F.2d at 1031; *Hamilton,* 792 F.2d at 841. We now hold explicitly that district court authority determinations are reviewed de novo.

*United States v. McConney* delineates this Circuit's approach to deciding the appropriate standard of review for the type of mixed questions of law and fact presented by authority determinations. 728 F.2d 1195, 1202 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). In *McConney* we stated:

> If application of the rule of law to the facts requires an inquiry that is "essentially factual"—one that is founded "on the application of the fact-finding tribunal's experience with the mainsprings of human conduct,"—the concerns of judicial administration will favor the district court, and the district court's determination should be classified as one of fact reviewable under the clearly erroneous standard. If, on the other hand, the question requires us to consider legal concepts in the mix of fact and law and to exercise judgment about the values that animate legal principles, then the concerns of judicial administration will favor the appellate court, and the question should be classified as one of law and reviewed de novo.

728 F.2d at 1202 (citations omitted).

■ *McConney* identified three distinct steps to deciding such a mixed question: (1) establishment of facts; (2) selection of the applicable rule of law; and (3) application of the law to the facts. *Id.* at 1200. The district court's determination of the facts is reviewed for clear error and its selection of the applicable rule of law is reviewed de novo. *Id.* at 1200–01. The standard of review for the district court's application of law to facts is based on a functional analysis. *Id.* at 1202.

Under the *McConney* approach, we must first ascertain if determination of authority to consent is "essentially factual" or instead requires a studied analysis of mixed facts and law. Judge Hall's dissent in *Hamilton* provides a persuasive argument for the latter characterization. 792 F.2d at 844–45 (affirming district court ruling that third party had apparent authority to consent to a motor home search) (Hall, J., dissenting). In response to the majority's decision not to determine the standard of review for authority decisions, Judge Hall argued that the Court should apply a de novo standard: "While a trial court may be in the best position to determine the actual extent of mutual use, the question of whether these facts constitute a 'sufficient relationship' for the purposes of the fourth amendment is an inherently legal one." *Hamilton,* 792 F.2d at 844.[1] As Judge Hall noted, this analysis requires us to "consider abstract legal doctrines, to weigh underlying policy considerations, and to balance competing legal interests." *Id.* at 844 (quoting *McConney,* 728 F.2d at 1205). We agree that this balancing presents a mixed question of law and fact that should be examined under a de novo standard.

Our decision is also guided by the constitutional implications of consent analysis. As *McConney* noted, de novo review is favored when courts apply the law to facts in constitutional cases. This process "requires consideration of the abstract principles that inform constitutional jurisprudence." *McConney,* 728 F.2d at 1203. Applying this test, *McConney* held that the "exigent circumstances" justifying a police search conducted without following standard proce-

---

1. Other circuits disagree on related consent issues, but none have confronted directly the question of authority to consent. The Eighth Circuit employs a clearly erroneous standard to assess a district court's ruling that a search was consensual, as well as its ruling that an individual had authority to consent to a search. *United States v. Brokaw,* 985 F.2d 951, 954 (8th Cir.), *cert. denied,* 510 U.S. 913, 114 S.Ct. 300, 126 L.Ed.2d 249 (1993).

By contrast, the D.C. Circuit has utilized a de novo standard in reviewing "the district court's conclusion that the search did not violate the fourth amendment." *United States v. Patrick,* 959 F.2d 991, 996 n. 6 (D.C.Cir.1992). It still employs a clearly erroneous standard, however, to review the district court's factual findings in support of its conclusion. *Id.*

dures is reviewable de novo because it is rooted in constitutional principles and policies. *Id.* at 1204–05. The same type of concerns are presented when reviewing the existence of authority to consent to a search: balancing society's interest in effective law enforcement with the expectations of privacy contained in the Fourth Amendment. Thus, applying de novo review in the present context is appropriate and consistent with our application of a de novo standard in "exigent circumstances" cases. *See United States v. Von Willie,* 59 F.3d 922, 925 (9th Cir.1995) (applying de novo review to exigent circumstances decision).

Analysis illustrates that review of a trial court's determination of authority to consent to a search requires a considered judgment of both factual circumstances and legal issues. Thus, we review the district court's authority decisions de novo.

### B. Authority Issue

■ Utilizing the de novo standard, we focus on Kim's argument that the district court erroneously denied his motion to suppress the evidence found in the PSM storage locker. Kim claims that Wee had neither actual nor apparent authority to consent to a search of the containers, as he was a mere employee operating at Kim's direction. Kim analogizes their relationship to sub-lessor and sub-lessee, arguing that Kim was essentially sub-leasing the units from Wee, and that consequently, Wee had no authority to consent to the search. We do not find this argument persuasive.

▪■ The Supreme Court has ruled that consent to a search must be made by an individual with common authority over the property. *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). The Court defined common authority as "joint access or control for most purposes." *Id.* at 171 n. 7, 94 S.Ct. at 993 n. 7. Cases subsequent to *Matlock* have emphasized that a consent-giver with limited access to the searched property lacks actual authority to consent to a search. For example, in *United States v. Warner,* 843 F.2d 401, 405, (9th Cir.1988), we held that a landlord's consent was insufficient even when the tenant gave

permission to the landlord to enter the premises in his absence. In *United States v. Impink,* 728 F.2d 1228, 1233 (9th Cir.1984), we suggested that a consent-giver whose right of access is "narrowly prescribed" would lack sufficient authority to consent to a search. The cases upholding searches generally rely on the consent-giver's unlimited access to property to sustain the search. *See United States v. Guzman,* 852 F.2d 1117, 1122 (9th Cir.1988) (holding that authority to consent was present when consent-giver had full access to property); *Sealey,* 830 F.2d at 1031 (same).

Here, the Government argues that Wee's name was on the lease and that he supervised loading of the tools into the storage units. The difficulty with this argument is that Kim had the only key to the lock and had general control over the unit. Wee did not have independent access and, without Kim's permission, Wee did not have the authority to open the unit (and never did open it for his own purposes). These factors put the case outside the "joint access or control for most purposes" test.

However, we have noted that *Matlock* also establishes an "assumption of risk" analysis. *See United States v. Sledge,* 650 F.2d 1075, 1080 n. 10 (9th Cir.1981) ("[A] defendant may assume the risk that the third party will at times exceed the scope of authorized access, as that is defined in precise and narrow terms...."). Here, Kim dispatched Wee to rent the storage units. By instructing Wee to lease the units in Wee's name, Kim assumed the risk that Wee could exercise his rights as lessee to have the storage company open the unit. In addition, Kim allowed Wee to keep possession of the leases, supervise unloading of the goods and retain the keys on occasion. At any time, Wee could have accessed the storage locker without Kim's knowledge or permission. Because Kim ceded partial control of the PSM lockers to Wee at all times, and allowed him total control on occasion, he assumed the risk that Wee would allow a search of the units. Thus, we find that Wee possessed common authority to consent to the search.

Because we find that actual authority existed we do not reach the alternative argument that Wee possessed apparent authority to consent to the search.

### III. Jury Verdict

Kim also appeals his conviction for possession of stolen property from a foreign shipment, alleging that the evidence presented was insufficient to support the jury's findings that: 1) he possessed stolen goods; and 2) the goods were part of foreign commerce-two elements of the offense for which he was convicted. This Court will not disturb the jury's findings of guilt if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Shortt Accountancy Corp.*, 785 F.2d 1448, 1453 (9th Cir.) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)), *cert denied*, 478 U.S. 1007, 106 S.Ct. 3301, 92 L.Ed.2d 715 (1986).

### A. Possession of Stolen Goods

■ Kim claims that the Government presented insufficient evidence at trial to support the jury's verdict that the goods found in the PSM storage locker were stolen. We disagree and hold that the evidence was sufficient to support the jury's decision.

Initially, the parties stipulated that various containers of goods, bearing certain identification numbers, were stolen from particular terminals and truck drivers on particular dates. With regard to the Campbell and Hausfeld tools, the parties stipulated that: "On May 13, 1995, container number NYKU6983889, which was loaded with approximately 1,789 cartons of 'Campbell and Hausfeld' tools, was stolen from Pacific Rim Transportation yard...."

Wee testified that he first handled goods for Kim during the end of April or early May 1995 and that he inventoried a 40–foot container of tools at Seaway warehouse on a Saturday in mid-May 1995. He stated that it contained approximately ten different types of tools, including drills, flashlights and

pumps and that these tools were subsequently moved to the PSM storage units.

Sang Ha Lee ("Lee"), President of Seaway, testified that the defendant contacted him to negotiate a price for the loading and transloading of various 40–foot containers of goods. According to Lee, the tools arrived on a Saturday and consisted of different types of hand tools.

Officer Garcia testified that his search of the storage locker revealed a large number of cardboard boxes, all containing various types of Campbell and Hausfeld tools and fittings. At trial, he identified a number of photographs depicting the recovered tools.

Danny Eckel ("Eckel"), the manager of International Logistics for Campbell and Hausfeld, testified that sometime after the theft, Pacific Rim Transport returned the goods to him. After conducting three separate inventories of the returned goods, including one by an independent surveyor, Campbell and Hausfeld concluded that they were the goods from the stolen containers. Of particular importance to this determination was the existence of a unique packaging color sleeve found on one of the tools recovered from the stolen container. As Eckel testified, "[t]his was the only time that the packaging itself was brought in alone. And it was only on this container."

Eckel also confirmed that part numbers on the cartons depicted in photographs of the stolen goods were numbers for the same type of items found in the stolen container. He testified that the value of the recovered items was about $37,000 less than the approximately $220,000 value of the stolen container.

Although the Government never presented direct evidence that the stolen tools were the same tools recovered from Kim's storage locker, we must draw all reasonable inferences in favor of the United States. *See Shortt*, 785 F.2d at 1453. Kim argues that the sum total of the evidence presented at trial does not enable us to infer that the goods recovered from his locker were the ones in the stolen container.

■ However, this theory would require us to hold that absent direct proof of theft, such as matching serial numbers, the govern-

ment could never prove that element of the crime. This is incorrect, as the Government may prove the existence of stolen goods by demonstrating that the recovered material is similar to the stolen items. *See United States v. Eagleston,* 417 F.2d 11, 15 (10th Cir.1969) (holding that when recovered clothing resembled stolen goods and inventory confirmed that the style, size, and color were similar, evidence was sufficient to support inference that goods were stolen); *Doss v. United States,* 355 F.2d 663, 665 (8th Cir. 1966) (same); *Marifian v. United States,* 82 F.2d 628, 629 (8th Cir.), *cert. denied,* 298 U.S. 686, 56 S.Ct. 956, 80 L.Ed. 1406 (1936) (holding that similarity of cartons, brands and labels was sufficient to establish that recovered items were goods reported stolen).

The evidence presented at trial illustrated that: Kim possessed Campbell and Hausfeld tools at around the same time that a container of Campbell and Hausfeld tools were stolen; one of the recovered goods had a distinctive packaging that was used only in the stolen container; the value of the recovered goods was greater than 80% of the original value of the goods in the stolen container; and part numbers for the stolen goods corresponded with the numbers for the items found in the recovered container. Consequently, the evidence supported the jury's finding that the goods recovered from the PSM storage locker were those stolen from Pacific Rim.

### B. Foreign Commerce

■ Kim also maintains that the Government failed to prove both as a matter of fact and of law that the goods were in foreign commerce when they were stolen.

First, Kim argues that the evidence was insufficient to prove that the tools were in foreign commerce when they were stolen, because the Government did not prove that they had not already reached their final destination. Kim propounds an alternate theory that the tools could have been delivered to their final destination, and then returned to the transport company prior to the theft. However, he provides no evidence to support this speculation.

In addition, the Government presented testimony that the goods were to be unloaded from the container in Fontana, California, not the temporary holding site in Long Beach. As the parties stipulated that *an entire container* of tools was stolen, it is reasonable to infer that the tools had not been delivered to Fontana, unloaded, repacked and returned to Long Beach. Thus, the evidence presented was sufficient to prove that the tools had not reached their final destination. *See United States v. Taylor,* 802 F.2d 1108, 1115–16 (9th Cir.1986) (holding that rational juror could conclude that stolen bonds had moved from New York to Las Vegas and thus were transported in interstate commerce), *cert. denied,* 479 U.S. 1094, 107 S.Ct. 1309, 94 L.Ed.2d 164 (1987).

Kim also argues that as a matter of law, even if the goods stolen from the Long Beach transportation yard had not yet reached their final destination, the tools were still not in foreign commerce. We have held that "[t]he determination of whether a shipment is in interstate commerce at a given time is essentially a practical one...." *United States v. Cousins,* 427 F.2d 382, 384–85 (9th Cir.1970) (concluding as a matter of law that liquor was in interstate commerce at time of theft). It is well established that evidence that goods have not yet reached their final destination is sufficient to prove that they are still in foreign commerce. *United States v. Padilla,* 457 F.2d 1403, 1404–05 (9th Cir.1972) (holding that goods stolen from port warehouse were "still in ambit of foreign commerce"); *Cousins,* 427 F.2d at 385 (holding that goods were still in foreign commerce when theft occurred from sealed railroad car before consignee accepted shipment). The Government presented adequate evidence to prove that the tools had not reached their final destination. Therefore, as a matter of law, the jury could conclude that the tools were still in foreign commerce when they were stolen.

**AFFIRMED.**