*757 SHIRLEY S. ABRAHAMSON, C.J.
*758 ¶ 45. The question presented in the instant case is: Can a weekend guest in a residence call the police and authorize a search of a living room and computer while the resident is at work? Or is such a search a violation of the resident's constitutional rights under the Fourth Amendment to the United States Constitution?
¶ 46. In other words, when is a person authorized under the law to invite law enforcement into someone else's residence or to allow law enforcement to search someone else's computer?[5]
¶ 47. The majority rules that a one-time weekend guest can consent to a search of the living room of the residence and the resident's computer. Yet the majority points to no case in any jurisdiction holding that a weekend guest under the circumstances of the present case may validly consent to a search of another's residence.[6]
*759 ¶ 48. The cases regarding consent to search a residence present a wide variety of consenting persons, *760 including a landlord, an unknown guest, a resident 15-year-old child, a resident 10-year-old child, a non-married co-resident, a resident spouse, a resident adult *761 child, and a non-resident houseguest of short duration. Yet none of these cases provides support for the majority's conclusion.
¶ 49. In United States v. Matlock, 415 U.S. 164, 171 (1974), the United States Supreme Court set forth the test applicable to all consenting persons, explaining that consent depends on "common authority" and rests "on mutual use of the property by persons generally having joint access or control for most purposes" or some "other sufficient relationship to the premises."[7]
¶ 50. The United States Supreme Court has also explained that a court must examine the circumstances of the consent to determine whether a consenting party is authorized by law to give consent[8] or whether the consent is sanctioned by the "commonly held understanding about the authority of co-inhabitants"[9] or by *762 "widely shared social expectations."[10] In consent cases, "widely shared social expectations" are "naturally enough influenced by the law of property, but not controlled by its rules."[11]
*763 ¶ 51. The application of the Matlock test and the Randolph "widely shared social expectations" test enables a court to determine whether it is reasonable to hold that the consenting party has the authority to consent in his or her own right and that the resident has "assumed the risk" that the consenting party might permit the common area or personal effect to be searched.[12]
¶ 52. There are no statutes or case law in Wisconsin applicable to the present case declaring that a weekend guest of limited duration has authority to consent to a search of another's residence.[13] So how do we apply the concepts of "common authority," "widely shared social expectations," and the resident's assumption of the risk in the present case?
¶ 53. We have no polls or social science research to advise us that, according to "widely shared social expectations," a weekend houseguest under the circumstances of the present case may consent to a search of the residence or a computer. Do the houseguest and the resident have "common authority" over the residence or the computer, that is, do they have "mutual use of the property because they have joint access or control for *764 most purposes"?[14] Did the resident (here the defendant) assume the risk of the houseguest's inviting law enforcement into the residence to search it or the computer?
¶ 54. Case law sets forth a number of facts for courts to consider when determining the authority of a third party to consent to a search of the residence of another. The validity of the search of the residence or the computer based on third-party consent requires an intensely fact-specific inquiry, and slight variations in the facts may cause the results to vary.[15] The inquiry into the validity of a consensual search is based on considerations of both property law and the invasion of privacy.[16]
*765 ¶ 55. I have examined Wisconsin case law, federal case law, and the case law of other states to list the factors courts examine to determine whether and when a third party has authority to consent to a search of a residence, that is, what facts persuade a court to conclude that a third party fits widely shared social expectations that he or she has authority to consent.
¶ 56. The following list of factors is not exclusive or exhaustive. The factors examine the characteristics of the consenting party and the consenting party's relationship to the resident and to the residence to answer the ultimate question from Matlock, namely whether the consenting party had "mutual use of the property" and is a person "generally having joint access or control for most purposes."
(1) Does the consenting person possess a key to the residence?[17]
*766 (2) Does the consenting person live in the residence?[18]
(3) Does the consenting person claim to be living in the residence?[19]
(4) Does the consenting person have a driver's license listing the residence as the driver's legal address?[20]
(5) Does the consenting person receive mail and bills at the residence?[21]
(6) Does the consenting person keep clothing at the residence?[22]
(7) Do the consenting person's children reside at the residence?[23]
*767 (8) Does the consenting person perform household chores at the residence?[24]
(9) Is the consenting person's name on the lease for the premises or does he or she pay rent?[25]
(10) Does the consenting person keep personal belongings such as a diary or a pet at the residence?[26]
(11) Is the consenting person allowed in the residence when the defendant is not present?[27]
(12) Do the consenting person and the defendant have a relationship to each other or the residence that supports the conclusion that the person has authority to consent?[28]
(13) Is the duration of the consenting person's stay in the residence of sufficient length to support the conclusion that the person has authority to consent?[29]
*768 ¶ 57. I consider all 13 factors, noting that the list is not exclusive or exhaustive, to determine whether, under Matlock, the consenting party had "mutual use of the property by persons generally having joint access or control for most purposes." Under the totality of the circumstances in the present case, I conclude that the houseguest did not have authority to give law enforcement consent to enter the residence.
¶ 58. The State has the burden to prove by clear and convincing evidence that a warrantless search was reasonable and in compliance with the Fourth Amendment.[30] Yet the State has failed to meet its burden to prove that the houseguest had actual authority to consent to a search because nothing in the record supports the majority's assertion that the defendant "must have envisioned [the houseguest's] 'mutual use of the property' and her possession of 'joint access or control for most purposes ....'" Majority op., ¶ 22. The record is distinguished by its singular lack of facts.
¶ 59. In the present case, the houseguest did not have any of the characteristics set forth in factors (1)-(10). As I stated previously, no precedent supports the majority's conclusion that this houseguest had actual authority to consent. She did not possess a key, *769 live in the residence, claim to live there, have a driver's license with the residence's address, receive mail or bills at the residence, keep clothes there, have her children or other relatives reside there, perform chores there, pay rent there, or keep personal belongings there.
¶ 60. When I look at factor (11), I conclude that the record shows that the houseguest here was alone in the residence for a few hours when the owner was not present one afternoon.[31]
¶ 61. With regard to factor (12), I note that courts have repeatedly reinforced the importance of the relationship between the defendant and the person consenting to the search in determining the authority of a consenting third party. The more distant the relationship, the more likely the resident has a reasonable expectation of privacy in relation to the third party and to spaces typically perceived as private.
¶ 62. In the present case, the nature of the relationship is not in the record. The majority opinion nonetheless assumes an intimate, romantic relationship. Indeed the entire majority opinion is premised on an intimate, romantic relationship supporting the inference that the houseguest was authorized to consent to others coming into the house.
*770 ¶ 63. In contrast to the majority opinion, the record merely indicates that the defendant and the houseguest had been "dating" for a few months. The parties' briefs describe the houseguest as the defendant's "girlfriend," but the officer testifying at the preliminary examination did not describe her as a girlfriend. The word "girlfriend" is not defined, and the relationship between the houseguest and the resident was not spelled out at the preliminary examination or in any part of the record or in the briefs. Very little evidence of the relationship is in the record from which inferences can be made.
¶ 64. I conclude the State has not met its burden of proof. Rather, the majority opinion has filled in the gaps in the State's proffered facts by imaginatively inferring an "intimate" romance without any proof in the record about the nature of the relationship.[32]
*771 ¶ 65. What is clear from the record is that the defendant and the houseguest did not have a relationship similar to those in cases in which courts have recognized that actual authority existed. The houseguest was not a member of the defendant's family, the defendant's spouse, an estranged spouse or a former spouse, the defendant's child or sibling, or the defendant's tenant or co-occupant or guest of substantial duration.
¶ 66. As to factor (13), the record is clear that the duration of the houseguest's stay in the residence was to be short, a weekend.[33]
¶ 67. A review of the 13 factors (and any other facts that were in the record) makes clear that the houseguest did not have "mutual use of the property by persons generally having joint access or control for most purposes." The guest had "access" to the residence for one purpose: to remain in the home on Saturday afternoon when the defendant went to work. As in United States v. Cos, 498 F.3d 1115, 1117 (10th Cir. 2007), the houseguest in the instant case was "more like an occasional visitor whom [the defendant] allowed to *772 visit, rather than one who asserted a right to access the property jointly with [the defendant]."
¶ 68. If we are discussing the extent of the houseguest's "control," the record is absolutely silent on whether she had any control whatsoever over the residence. Nothing in the record indicates that she could invite friends over or have them use any room she occupied or exercise authoritative or dominating influence over the residence, as a dictionary definition of "control" contemplates.[34] Any inferences regarding the extent of her control are improper. The record is absolutely silent on facts from which inferences of control can be made.
¶ 69. Any access and control of the houseguest in the present case was limited to the temporary access and control a weekend guest might have when invited to someone else's home to stay for a short time. The houseguest did not share "joint" access or control, which contemplates that she "shared" an interest or had a "common interest" in the residence. Any access or control the houseguest had to the residence was clearly *773 inferior to that of the defendant, and not "joint" by any definition of the word. The use of the premises by the defendant and the houseguest could not be called "mutual" by any definition of that word.
¶ 70. In sum, all that can be gleaned from this evidence-deficient record is that a weekend houseguest described in the briefs as a girlfriend but of unknown relationship to the resident-defendant was given consent to use the defendant's computer and was left in the residence alone for a few hours on a Saturday afternoon while the resident-defendant was working. The record reveals nothing more.
¶ 71. This record does not support a reasonable inference that the houseguest has authority to consent to a law enforcement entry or search of the residence. No precedent supports the majority's conclusion that such a houseguest has authority to invite law enforcement officers into the home.
¶ 72. Under the majority opinion, it is easier for a weekend houseguest than for a co-resident to be accorded authority to consent to a search of another's residence. The majority opinion's rationale is illogical on its face and contravenes precedent.
¶ 73. In Illinois v. Rodriguez,[35] the United States Supreme Court concluded that a former girlfriend, who had previously lived in the defendant's apartment and still occasionally spent the night and had a key, did not have actual authority to consent to a search of the apartment.[36] The consenting third party in Rodriguez has a stronger connection to the resident and to the residence than the consenting third party in the present case, yet this court reached a different conclusion than the United States Supreme Court.
*774 ¶ 74. The Rodriguez case has been cited favorably numerous times, including in the recent United States Supreme Court decision in Randolph v. Georgia.[37] Yet the majority simply rejects the Supreme Court's holding as "cursory". Majority op., ¶ 17. Justice Scalia may be amused to learn that the majority of justices of the Wisconsin Supreme Court characterizes his measured and deliberate approach in Rodriguez as "cursory" and refuses to recognize it as a binding interpretation of the Fourth Amendment of the United States Constitution. The simple fact that the United States Supreme Court reached multiple conclusions in Rodriguez and chose to spend more time explaining the doctrine of apparent authority rather than actual authority does not diminish the importance of its holding about actual authority and does not permit us to ignore its holding.[38]
¶ 75. In Rodriguez, police were called to the residence of Dorothy Jackson. There, police were met by Ms. Jackson's daughter, Gail Fischer, who showed signs of a severe beating and indicated she had been assaulted by Edward Rodriguez, who Fischer believed *775 was asleep in his apartment.[39] Fischer consented to travel to the apartment with the police in order to unlock the door for them with her key. Police learned that Fischer referred to the residence as "our" apartment, had a key, and had clothes and furniture there. It is unclear whether Fischer told the police that she currently lived in the apartment, but in fact she had lived there for six months with her two small children and Rodriguez and had moved out a few weeks earlier. Even after she moved out, Fischer occasionally spent the night at Rodriguez's apartment.[40]
¶ 76. The question posed to the high court in Rodriguez was whether Fischer had actual or apparent authority to consent to the search of Rodriguez's apartment. Justice Scalia addressed the issue and relied on the Matlock test, that is, there is authority to consent when there is "common authority" that rests "on mutual use of the property by persons generally having joint access or control for most purposes."[41] Justice Scalia, writing for the Rodriguez Court, concluded that on the basis of the record it was clear that the State had not met its burden of establishing that Fischer had common authority over the residence.[42]
¶ 77. Although Fischer had a key, had previously lived in the residence with her children, had clothes and furniture there, and occasionally spent the night there *776 after moving out, the Court ruled that Fischer did not have "joint access or control for most purposes." After this thorough explanation, Justice Scalia concluded that the lower courts' determination of no common authority over the apartment was "obviously correct."[43] Once Fischer no longer resided there she became a temporary guest without common authority, like the houseguest in the present case. The Court then moved to the issue of apparent authority, an issue not presented in the instant case.
¶ 78. The facts in Rodriguez and the present case are similar: Both Fischer and the houseguest here called the police to report a crime. Both let the police into the residence in which they did not live. Although Fischer had a greater attachment to the apartment, had a closer relationship to the defendant, had a key, and had spent a longer time in the apartment than the houseguest in the present case, the United States Supreme Court held that Fischer did not have actual authority to consent to the search.
¶ 79. Following Rodriguez, federal and state courts alike have held the line, refusing to recognize that temporary guests, without more, have actual authority to consent. Professor LaFave explains that "[t]here is sound authority that, at least when the guest is more than a casual visitor and 'had the run of the house,' his lesser interest in the premises is sufficient to render that limited consent effective."[44] Professor LaFave takes the "run of the house" language from United States v. Turbyfill, 525 F.2d 57 (8th Cir. 1975). In Turbyfill, the United States Court of Appeals for the Eighth Circuit held that an "occupant of indefinite *777 duration rather than a casual visitor" who "had the run of the house" could consent to a search of the residence.[45]
¶ 80. Although the majority opinion attempts to offer "something more" for the houseguest in the present case to render her more than a casual visitor for a limited duration, the majority opinion's "offer" is something far less than what existed in Turbyfill and Rodriguez, and the "something more" that other courts have carefully required.
¶ 81. In United States v. Cos, 498 F.3d 1115 (10th Cir. 2007), the United States Court of Appeals for the Tenth Circuit recognized that a relationship between a man and a woman who "had dated for a short time" is not the equivalent of relationships that establish a presumption of control: those between parent and child and between husband and wife.[46]
¶ 82. In Cos, a guest who had been dating the tenant and was possibly living with him, and clearly had spent the night and had been left alone in the apartment on multiple occasions, did not have actual nor apparent authority to consent to a search when police arrived while she was in the apartment in the tenant's absence.[47]
¶ 83. The Tenth Circuit concluded that the guest was "more like an occasional visitor whom [the defendant] allowed to visit, rather than one who asserted a right to access the property jointly with [the defendant]."[48] The facts of Cos are substantially similar to *778 the facts of this case, and the Tenth Circuit's definition of the guest who cannot consent matches the houseguest in the present case.
¶ 84. When the analysis turns to the search of the defendant's laptop, I agree with the majority opinion that "an independent analysis must be performed to determine" whether the houseguest had authority to consent to a search of the defendant's laptop. Majority op., ¶¶ 30-31. In contrast to the position taken by the concurrence, the majority opinion and I agree: "Courts must independently consider whether a third party has the authority to consent to a search of a residence and whether the third party has authority to consent to particular containers within that residence."[49] A computer has long been analogized to a closed container for Fourth Amendment purposes.[50] Authority to consent to search a room does not necessarily extend to authority to consent to search closed containers within that room.[51]
¶ 85. "A valid consent to search the closed container must come from one who has common authority over the effects sought to be inspected, one who has mutual use of the property, and one who generally has joint access or control for most purposes."[52]
*779 ¶ 86. Without precedent or analysis, the concurrence asserts that "it is undisputed" that the defendant's laptop could be searched wherever police like "in a myriad of other places." Concurrence, ¶¶ 38, 42.
¶ 87. The concurrence turns a blind eye to the Fourth Amendment's prohibition of unreasonable searches not only of "persons [and] houses," but also of "papers and effects." The defendant's computer is one of the defendant's effects. The Fourth Amendment protects the contents of a computer from government intrusion whether the computer is found inside or outside the home.
¶ 88. A computer is not just another container. It is more like a filing cabinet or safe ordinarily containing substantial personal data.[53]
*780 ¶ 89. Law enforcement needs a valid exception to the warrant requirement to engage in a warrantless search of the contents of the computer. The only exception applicable to the computer in the present case is consent. No other Fourth Amendment exception applies.
¶ 90. Therefore, when addressing whether the houseguest had actual authority to consent to a search of the computer inside or outside the home, the court must complete a consent analysis specifically applicable to the computer. The majority opinion does so in vain, but the concurrence believes it need not even go through the motions.
¶ 91. In State v. Carroll, 2010 WI 8, 322 Wis. 2d 299, 778 N.W.2d 1, this court addressed whether police could search the contents of a cellular telephone incident to arrest after noticing an image on the screen that appeared to include illegal drugs. Our court held that law enforcement cannot search a cellular telephone (a personal electronic device) without a warrant when there is no immediate danger of the data disappearing before a warrant can be obtained.[54]
¶ 92. Thus, the concurrence ignores the established precedent of this court, which requires law enforcement to get a warrant to search a personal electronic device when no valid exception to the warrant requirement applies.
¶ 93. The ultimate question is whether the houseguest shared "joint access or control" of the computer *781 "for most purposes." From the limited record, all we know is that the houseguest was permitted to use the defendant's computer on the fateful afternoon "because she was bored and wanted something to do." The computer belonged solely to the defendant, and the defendant and the houseguest did not generally share common authority over it. We do not know whether the defendant provided any parameters on its use.
¶ 94. The State has not demonstrated that the defendant "assumed the risk" that the houseguest who had authority to use the computer also had authority to open every single file on the computer, including those containing child pornography, personal financial records, health information, or other confidential data.
¶ 95. For the same reasons that I conclude that the houseguest did not have actual authority to consent to the search of the home, I conclude she also did not have actual authority to consent to the search of the contents of the computer. The State has failed to meet its burden to prove that the houseguest had actual authority to consent to a search of private computer data. The State did not prove that the defendant "assumed the risk" that the houseguest would access his personal files on the computer and invite the police to join her any more than he would assume the risk that she would open desk drawers just because she could use the surface of the desk.
¶ 96. This court's decision today disregards Wisconsin and United States Supreme Court precedent and rulings in other jurisdictions.
¶ 97. For the reasons set forth, I dissent.
¶ 98. I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.

 No exigent circumstances existed in the present case justifying a warrantless search of the residence or the computer. There was plenty of time for law enforcement to get a warrant. For a discussion of when exigent circumstances may justify a warrantless search, see Missouri v. McNeely, __U.S. __, 133 S. Ct. 1552 (2013).

 The majority opinion discusses many cases as a basis for its holding. In not one of these cases did the court rule that a non-resident had actual authority to consent to a search of a residence.
In State v. Kieffer, 217 Wis. 2d 531, 577 N.W.2d 352 (1998), this court held that the defendant's father-in-law lacked actual and apparent authority to consent to a search of a loft area above the father-in-law's garage, where the defendant and his wife were living.
*759 In Chapman v. United States, 365 U.S. 610 (1961), a landlord did not have actual authority to consent to a search of a tenant's home.
In Commonwealth v. Lopez, 937 N.E.2d 949, 958 (Mass. 2010), an unknown woman who opened the door of the defendant's home had neither actual nor apparent authority to consent to a search. Although the Commonwealth conceded the unknown woman did not have actual authority, the Massachusetts court noted that a cohabitant is a "person who lives in the home, either as a member of the family, a roommate, or a houseguest whose stay is of substantial duration and who is given full access to the home," and that this cohabitant may have actual authority to consent to a warrantless search. Lopez, 937 N.E.2d at 956-57 n.9 (quoting Commonwealth v. Porter P., 923 N.E.2d 36 (Mass. 2010)).
In United States v. Sanchez, 608 F.3d 685, 687 (10th Cir. 2010), the United States Court of Appeals for the Tenth Circuit held that the homeowner's 15-year-old daughter who lived in the home had actual authority to consent to a search of the home.
In Davis v. State, 422 S.E.2d 546, 549 (Ga. 1992), a 10-year-old child who lived in the residence did not have sufficient authority to consent to a search of his parents' home.
In State v. St. Martin, 2011 WI 44, ¶ 2, 334 Wis. 2d 290, 800 N.W.2d 858, cert. denied, 565 U.S. __ (2012), this court held that a co-tenant's consent is valid as against the absent, non-consenting co-tenant (citing United States v. Matlock, 415 U.S. 164, 170 (1974)).
In United States v. Collins, 515 F. Supp. 2d 891, 902 (N.D. Ind. 2007), a wife and son who occupied the home with their husband/father, the defendant, and had a "close personal and familial relationship with" the defendant, had actual authority to consent to a search of their home, where the defendant's computer was located (citing United States v. Duran, 957 F.2d 499, 504-05 (7th Cir. 1992) (holding that "a spouse presumptively has authority to consent to a search of all areas of the homestead . ..")); see also United States v. Ladell, 127 F.3d 622, *760 624 (7th Cir. 1997) ("A third-party consent is also easier to sustain if the relationship between the parties — parent to child here, spouse to spouse in other cases — is especially close.").
In United States v. Groves, 530 F.3d 506, 510 (7th Cir. 2008), a co-occupant had actual authority to consent to a search when she lived in the residence; registered the residence's phone in her name; registered her daughter for school using the residence's address; kept clothes, mail, bills, and drugs at the residence; cleaned the residence; and had a key and unlimited access to the residence.
In United States v. Kim, 105 F.3d 1579, 1580-83 (9th Cir. 1997), an employee had actual authority to consent to a search of his employer's rented storage locker when the employee had been hired to lease the locker and the lease was in the employee's name while the employer's name was listed only as an additional person authorized to access the unit.
In State v. Vinuya, 32 P.3d 116, 132 (Haw. 2001), the defendant's mother, who owned and resided in the home with the defendant, could consent to a search of most of the home, but did not have actual authority to consent to a search of the defendant's locked bedroom.
In United States v. Cos, 498 F.3d 1115, 1117-18 (10th Cir. 2007), a woman whom the defendant was dating did not have actual or apparent authority to consent to a search of the defendant's home. The woman had spent the night on multiple occasions and had been alone in the apartment when the defendant went out, but did not have a key, did not live there, did not pay rent, was not named on the lease, and did not keep any personal belongings in the apartment. In Cos, the Tenth Circuit concluded that the "girlfriend" did not have "mutual use" or "joint access" because she could not enter the apartment without the defendant's consent. She was "more like an occasional visitor whom [the defendant] allowed to visit, rather than one who asserted a right to access the property jointly with [the defendant]." Cos, 498 F.3d at 1127.
*761 More importantly, the Cos court recognized that a short-term dating relationship is not the equivalent of the relationships that establish a presumption of control: those between parent and child and between husband and wife. Cos, 498 F.3d at 1128.

 "The [United States Court of Appeals for the] Ninth Circuit has summarized post -Matlock cases as requiring that 'a consent-giver with limited access to the searched property lacks actual authority to consent to a search. . . . The cases upholding searches generally rely on the consent-giver's unlimited access to property to sustain the search.'" Braskett v. Fender, 884 F. Supp. 2d 1119, 1130 (D. Ore. 2012) (quoting United States v. Kim, 105 F.3d 1579, 1582 (9th Cir. 1997)).

 For example, a landlord may be able to show the police a written lease agreement allowing the landlord to enter the residence for any purpose and to permit others to enter the residence.

 Randolph, 547 U.S. at 111. The Randolph court, 547 U.S. at 109 n.2, explained its use of the word "co-inhabitants" as follows: "Mindful of the multiplicity of living arrangements, we vary the terms used to describe residential co-occupancies. *762 In doing so we do not mean, however, to suggest that the rule to be applied to them is similarly varied."

 Randolph, 547 U.S. at 111.

 Id.
For a discussion of the role of both property law and privacy law in interpretation of the Fourth Amendment, see Florida v. Jardines, __U.S. __, 133 S. Ct. 1409 (2013). In Jardines, the United States Supreme Court ruled that police conducted an illegal search within the meaning of the Fourth Amendment when, without a warrant, they used a police dog on the porch of a home to sniff for drugs inside the home.
Five justices in Jardines relied on property law. The majority decision, written by Justice Scalia, explained that "[t]he Katz reasonable-expectations test 'has been added to, not substituted for,' the traditional property-based understanding of the Fourth Amendment. . ."(emphasis in original). The Jardines Court also discussed its recent decision in United States v. Jones, __U.S. __, 132 S. Ct. 945, 948-52 (2012), explaining that "[in Jones], we held that tracking the vehicle's movements was a search: a person's 'Fourth Amendment rights do not rise or fall with the Katz formulation.'". Jar-dines, 133 S. Ct. at 1417 (quoting Jones, 132 S. Ct. at 951-52).
Justice Kagan, joining the Scalia opinion and separately concurring with two justices, explained that property and privacy concepts mostly align in Fourth Amendment cases, writing, "The Court today treats this case under a property rubric; I write separately to note that I could just as happily have decided it by looking to Jardines' privacy interests."
Justice Kagan went on to explain, "The law of property 'naturally enough influence^]' our 'shared social expectations' of what places should be free from governmental incursions. And so the sentiment 'my home is my own,' while originating in property law, now also denotes a common understanding — extending even beyond that law's formal protections — about an especially private *763 sphere." Jardines, 133 S. Ct. at 1419 (Kagan, J., concurring) (citations omitted).

 Randolph, 547 U.S. at 111 (quoting United States v. Matlock, 415 U.S. 164, 171, n.7 (1974)).

 In the two opportunities this court has had to consider consent by a non-resident, this court has concluded that the non-resident did not have actual authority to consent. State v. Kieffer, 217 Wis. 2d 531, 577 N.W.2d 352 (1998); State v. McGovern, 77 Wis. 2d 203, 252 N.W.2d 365 (1977) (a person living in a tent on the grounds of the residence did not have authority while in the residence to consent to entry in the residence).

 Although Professor LaFave recognizes that a guest may consent to a search in certain circumstances, he explains:
[A] host and guest cannot be said to have 'common authority' over the premises, in the sense in which that phrase is used in Matlock. Generally, it must be concluded that the host's interest in the premises and authority to permit a search of them is superior to that of the guest. This being so, it may be said that ordinarily a mere guest in premises may not give consent to search of those premises which will be effective against the superior interest and authority of the host.
4 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 8.5(e) (5th ed. 2012) (citing United States v. Cos, 498 F.3d 1115 (10th Cir. 2007); People v. Wagner, 304 N.W.2d 517 (Mich. App. 1981); State v. Manns, 370 N.W.2d 157 (Neb. 1985)).

 United States v. Shelton, 337 F.3d 529, 535 (5th Cir. 2003). See also note 11, supra.

 In Shelton, 337 F.3d at 535-36, the court discussed viewing consent through the prism of the law relating to privacy as follows:
Although consent to a search is a well-established exception to the requirement for a warrant issued on the basis of probable cause, courts have left the theory underlying this rule largely unarticu *765 lated. The validity of a consensual search is presumably based on the premise that a warrant and probable cause are unnecessary to justify the invasion of privacy that accompanies a consensual search, because by consenting, the individual evinces a voluntary willingness to forgo that privacy. Similarly, third party consent presumably extends the capacity to give consent to individuals to whom the one with the privacy interest has already substantially ceded his expectation of privacy....
Viewing third-party consent through the prism of privacy interests enables us to approach the question of common authority by asking whether A sufficiently relinquished his expectation of privacy to B, i.e., allowed mutual or common use of the premises to the extent of joint access and control for most purposes, so that it is reasonably anticipated that B might expose the same privacy interest to others, even including law enforcement officers (emphasis added).

 State v. St. Martin, 2011 WI 44, ¶ 18 n.10, 334 Wis. 2d 290, 800 N.W.2d 858 (quoting Groves, 530 F.3d at 509).
The St. Martin test was taken from a longer list of factors laid out by the Seventh Circuit in United States v. Groves, in which the court examined 10 factors to determine whether a *766 defendant's girlfriend had actual or apparent authority to consent to a search of the defendant's residence.

 State v. St. Martin, 2011 WI 44, ¶ 18 n.10, 334 Wis. 2d 290, 800 N.W.2d 858 (quoting Groves, 530 F.3d at 509).
See also Commonwealth v. Porter P., 923 N.E.2d 36, 47-48 (Mass. 2010), explaining:
[A] person may have actual authority to consent to a warrantless search of a residence by the police only if (1) the person is a coinhabitant with a shared right of access to the residence, that is, the person lives in the home, either as a member of the family, a roommate, or a houseguest whose stay is of substantial duration and who is given full access to the home; or (2) the person, generally a landlord, shows the police a written contract entitling that person to allow the police to enter the home to search for and seize contraband or evidence.

 United States v. Groves, 530 F.3d 506, 509-10 (7th Cir. 2008) (quoting United States v. Groves, 470 F.3d 311, 319 n.3 (7th Cir. 2006), for its list of factors).

 State v. St. Martin, 2011 WI 44, ¶ 18 n.10, 334 Wis. 2d 290, 800 N.W.2d 858 (quoting Groves, 530 F.3d at 509).

 Groves, 530 F.3d at 509.

 Id.

 Id. at 509-10.

 Id. at 510.

 Id.

 Id.

 Id.
In Groves, the defendant's girlfriend was a co-occupant who registered her daughter for school using the residence's address; registered the residence's phone in her name and paid the monthly bill; kept clothes, mail, bills and drugs in the residence; regularly cleaned the residence; and had a key and unlimited access to the residence.

 Thus, courts have recognized the authority of mature children, United States v. Sanchez, 608 F.3d 685, 687 (10th Cir. 2010); siblings, People v. Shaffer, 444 N.E.2d 1096 (Ill. App. Ct. 1982); spouses, United States v. Ladell, 127 F.3d 622, 624 (7th Cir. 1997); United States v. Duran, 957 F.2d 499, 504-05 (7th Cir. 1992); United States v. Collins 515 F. Supp. 2d 891, 902 (N.D. Ind. 2007); and occupants under certain circumstances, United States v. Turbyfill, 525 F.2d 57, 58-59 (8th Cir. 1975) (an "occupant of indefinite duration rather than a casual visitor" who "had the run of the house" could consent to a search of the residence).

 The guest has to stay for a "substantial duration" to be authorized to consent. Turbyfill, 525 F.2d at 58-59.
*768 See also Commonwealth v. Porter P., 923 N.E.2d 36, 47-48 (Mass. 2010), explaining:
[A] person may have actual authority to consent to a warrantless search of a home by the police only if (1) the person... [is] a houseguest whose stay is of substantial duration and who is given full access to the home ....
It is difficult to argue with a straight face that one or two nights is a substantial duration in anything but the life of a mayfly.

 State v. Kieffer, 217 Wis. 2d 531, 541, 577 N.W.2d 352 (1998).

 The record does indicate that the defendant left sometime in the afternoon for his evening job as a bartender. The record indicates that Officer Dorn was dispatched to the residence at 5:32 p.m. Thus, the houseguest was alone in the residence from sometime in the afternoon when the defendant left for his evening job until Officer Dorn arrived at 5:32 p.m.
In this brief period of time in the afternoon between when the defendant left for his evening job and 5:32 p.m., the houseguest probably spent about an hour away from the residence walking to and from the nearest gas station to call her grandma.

 The majority opinion indicates that the defendant and his guest were boyfriend and girlfriend, in a romantic, intimate relationship, which it argues is an important fact to support its finding that she had actual authority to consent to a search of at least part of the residence. Majority op., ¶¶ 2 n.l, 20 n.12, 22, 25, 28. The majority opinion uses the words "romantic" or "intimate" at least 15 times.
More properly, as the record reveals, the houseguest and the defendant met online, approximately three months earlier, and they had been "dating," an undefined term. The majority apparently assumes that a 22-year-old man is having a romantic, intimate relationship with a 20-year-old woman whom he invites over for the weekend while his parents are away.
According to the record, the houseguest lived in Kenosha and the defendant lived in Hartford, approximately a 90-minute drive apart. The houseguest apparently did not have a car or a phone while she was at the defendant's residence. The defendant had a bartending job which required him to work at night.
*771 I infer from the facts that are in the record that the defendant and the houseguest had met at least one time before this fateful weekend because the defendant had a picture of himself with the houseguest as his computer background.
The record does not state how many times the two had actually met in person before the weekend at issue, or how many "dates" they had. The record is silent about whether the houseguest had previously stayed at the defendant's residence.

 According to the record, the houseguest arrived at the defendant's residence on Friday and planned to leave on Sunday. She left, however, on Saturday after filing the complaint. The actual duration of her stay in the residence was one night and part of a day.

 The majority opinion's discussion of the houseguest's control of the residence is itself internally inconsistent, making it clear that the majority does not really know how much control she had while providing poor guidance for future courts. At one point, the majority opinion takes a broad approach, explaining that "a weekend guest left in a home alone cannot legally sell the property, but it seems she can do a great deal else with it." Majority op., ¶ 23. Later, the majority opinion "underscored] the limitations of today's decision," explaining that the houseguest did not have "carte blanche" to consent to a search of all parts of the house. Majority op., ¶ 32.
All this leaves me perplexed. The houseguest apparently can do almost anything "with [the house]." The houseguest cannot, however, sell the house or consent to a search of certain parts of it. What about the bedroom where she slept or kept her clothes?

 Illinois v. Rodriguez, 497 U.S. 177 (1990).

 Id., 181-82.

 Randolph, 547 U.S. at 106, 109.

 As the majority opinion explains in ¶ 18 n.10, the Rodriguez court applied the Matlock test in holding that the guest had no actual authority to consent to the search. The Rodriguez decision directly quotes the Matlock test, explaining that "the State has not established that... [the houseguest] had 'joint access or control for most purposes.'" Rodriguez, 497 U.S. at 181-82. Nevertheless, the majority opinion asserts that the Rodriguez result is "incompatible" with the Matlock test. Majority op., ¶ 18 n.ll. How does tension exist between Matlock and Rodriguez, as the majority opinion asserts, when one United States Supreme Court decision directly relies on the standard put forth in another? The majority opinion attempts to resolve a nonexistent tension, never distinguishing the facts of Rodriguez from those in the present case for purposes of deciding the authority of the houseguest.

 Fischer indicated that the assault had occurred earlier in the day. The United States Supreme Court opinion does not indicate whether Fischer had spent the previous night in the apartment or the number of hours she spent in the apartment that day.

 Rodriguez, 497 U.S. at 179-82.

 Id. at 181 (quoting United States v. Matlock, 415 U.S. 164, 171, n.7 (1974)).

 Illinois v. Rodriguez, 497 U.S. 177, 181-82 (1990).

 Rodriguez, 497 U.S. at 181-82.

 4 Wayne R. LaFave, supra note 14, at § 8.5(e) (emphasis added).

 Turbyfill, 525 F.2d at 58-59.

 Cos, 498 F.3d at 1128.

 Id. at 1117-18.

 Id. at 1127.

 United States v. Smairat, 503 F. Supp. 2d 973, 987 (N.D. Ill. 2007) (citing Groves, 470 F.3d at 320).

 See, e.g., United States v. Blas, 1990 WL 265179, *21 (E.D. Wis. 1990) ("[A]n individual has the same expectation of privacy in a pager, computer or other electronic data storage and retrieval device as in a closed container ....")

 Smairat, 503 F. Supp. 2d at 987 (citing Rodriguez, 888 F.2d at 523).

 United States v. Waller, 426 F.3d 838, 845 (6th Cir. 2005) (citing United States v. Karo, 468 U.S. 705, 725-26 (1984) (O'Connor, J., concurring)).

 Judge Posner recently wrote:
Judges are becoming aware that a computer (and remember that a modern cell phone is a computer) is not just another purse or address book. '[Analogizing computers to other physical objects when applying Fourth Amendment law is not an exact fit because computers hold so much personal and sensitive information touching on many private aspects of fife.. .. [T]here is a far greater potential for the 'inter-mingling1 of documents and a consequent invasion of privacy when police execute a search for evidence on a computer.'... At the touch of a button a cell phone search becomes a house search, and that is not a search of a 'container' in any normal sense of that word, though a house contains data.
United States v. Flores-Lopez, 670 F.3d 803, 805-06 (7th Cir. 2012) (internal citations omitted).
See also Smallwood v. Florida, 2013 WL 1830961, *7, 113 So.3d 724 (Fla. 2013) ("The most private and secret personal information and data is contained in or accessed through small portable electronic devices and, indeed, many people now store documents on their equipment... that, twenty years ago, were stored and located only in home offices, in safes, or on home computers.").

 State v. Carroll, 2010 WI 8, ¶ 33, 322 Wis. 2d 299, 778 N.W.2d 1 (citing Arkansas v. Sanders, 442 U.S. 753 (1979) (Officers with probable cause to believe a suitcase contained contraband were justified in seizing that suitcase, but the Fourth Amendment precluded their immediate search of the suitcase without a warrant.)).